Sandra S. BOLYEA, a/k/a Sandra C. Schliter, Plaintiff and Respondent,

v.

The FIRST PRESBYTERIAN CHURCH OF WILTON, N. D., et al., Defendants and Appellants.

Civ. No. 8786.

Supreme Court of North Dakota.

March 29, 1972.

Conmy, Conmy, Rosenberg, Lucas & Olson, Bismarck, for Max D. Rosenberg, Executor of Estate of Norman Hall, deceased, defendant and appellant.

Williams & Lindell, Washburn, for The First Presbyterian Church of Wilton, N. D., The First Lutheran Church of Washburn, N. D., and The Washburn Methodist Church, Washburn, N. D., defendants and appellants.

Zuger, Bucklin & Zuger, Bismarck, for plaintiff and respondent.

TEIGEN, Judge.

The defendants (hereinafter Hall Estate) have appealed from a judgment quieting the title to approximately fourteen quarter sections of farm land in the plaintiff, Sandra S. Bolyea, a/k/a Sandra C. Schliter (hereinafter Sandra), and against these defendants.

The land in issue had been owned by Norman Hall, who died testate on November 23, 1970.

Sandra's assertion to ownership of the land is based on her claim that Norman Hall deeded the land to her on or about October 24, 1963, but that the deeds were not recorded and were lost.

The Hall Estate answered and, in addition to a general denial, alleged lack of con-

sideration, incompetence of Norman Hall, and execution under undue influence. They also claim that the three churches named in this title are the owners, as devisees under the Last Will and Testament of Norman Hall, dated April 22, 1969.

The action was tried to the court with an advisory jury. The jury answered all special interrogatories submitted to it in Sandra's favor. The answers of the jury were accepted by the trial court in making its findings of fact. Judgment was entered in favor of the plaintiff, quieting the title to the land in Sandra. The issues in this appeal, formed by the specifications of error served with the notice of appeal, present only questions of law. In order to understand the issues presented on this appeal, a brief statement of the facts follows.

Sandra was the stepdaughter of Norman Hall. Sandra's mother, Valena Schliter, and Norman Hall were married on November 2, 1960, when Sandra was sixteen years of age. Sandra had known Norman Hall since she was eight or nine years old. She does not remember her biological father, whom her mother had divorced many years earlier. Sandra's mother Valena (Norman Hall's wife) died on October 16, 1963. The evidence establishes, and the jury and the trial court found, that, eight days later, to wit, on October 24, 1963, Norman Hall executed two quitclaim deeds conveying the land in issue in this action to Sandra, and delivered both deeds to her; that, subsequently, for the purpose of safekeeping, he reobtained possession of the deeds. The deeds were not recorded. Norman Hall died on November 23, 1970. Following his death a search was made for the deeds in question but they were not found and are deemed lost. The Last Will and Testament of Norman Hall, dated April 22, 1969, duly certified by the county court where it had been admitted to probate, was received in evidence. This will makes a number of bequests to various beneficiaries and purports to devise "all of my real estate, wheresoever

situated or located in equal shares" to the three churches named in the title of this action. The will does not describe the testator's real estate and the record does not establish whether or not Norman Hall owned real estate in addition to the real estate described in this action. The evidence establishes that, subsequent to October 24, 1963, and until Norman Hall's death on November 23, 1970, he continued to occupy the real estate in issue in this action, to operate it, to take the profits, and to pay the taxes.

The Hall Estate has specified a number of claimed errors. They have been consolidated into six issues, which are relied upon for a reversal and new trial. Three of these issues assert error in ruling on objections to evidence; one asserts error in refusing to give a requested instruction; and two involve the court's findings of fact and conclusions of law, asserting that certain findings were improper findings and that the findings of fact do not support the conclusions of law.

No claim is made that the evidence admitted does not support the judgment.

We will first consider the three assignments of error which pertain to the admission and exclusion of certain evidence, as follows:

First: The contention that it was error for the trial court to permit the attorney and his secretary, who drew the lost deeds, to testify concerning communications made by Norman Hall, now deceased, and advice given and work done by the attorney for his client.

Second: The contention that the trial court erred in denying a motion to strike the testimony of Sandra on the grounds that it was irrelevant and in violation of the dead man's statute. Section 31–01–03, N.D.C.C.

Third: The claim that it was error for the trial court to exclude testimony of three potential witnesses concerning acts and declarations of Norman Hall, the gran-

tor, subsequent to the execution and delivery of the lost deeds.

■■ With respect to the assignment that it was error to admit the testimony of the attorney and his secretary who drew the deeds, the Hall Estate cites Section 31–01–06(1), N.D.C.C., which provides:

"An attorney, without the consent of his client, cannot be examined as to any communication made by the client to him, nor as to his advice given thereon in the course of professional employment."

When this objection was raised in the trial court, it found the evidence at that point established that Norman Hall did not intend that the matters about which he consulted the attorney were to be confidential or were to be withheld from Sandra. Evidence of record when the attorney was called established that Norman Hall had chosen to consult with his attorney in the presence of others who accompanied him to the attorney's office.

Before the attorney was called to the witness stand, two witnesses had testified relative to the visit to the attorney's office. These witnesses were Halley Nelson and his wife Grace. It appears from their testimony that, on October 24, 1963, Norman Hall invited Sandra and the Nelsons to accompany him from the Wilton area to Bismarck, North Dakota, where he was going for the purpose of transacting some business. With Mr. Hall driving his automobile, these four people proceeded to Bismarck. Upon arrival, Mr. Hall first went into the Dakota National Bank but returned shortly to his automobile and he then drove to Mandan, North Dakota. They had lunch in Mandan and, following lunch, they walked together down the street looking for an attorney's office. They passed by the office of the first attorney they found because Mr. Hall had some objection to him. They then went on and entered the second attorney's office, which was the office of Clarence J. Schauss, the

attorney whose testimony was admitted, over objection, in this trial.

According to these witnesses they entered Attorney Schauss's office, where Norman Hall stated to Attorney Schauss, ·in their presence, that the purpose of his call was to ask Attorney Schauss to prepare deeds whereby he, Norman Hall, would convey his land to Sandra. After having stated the purpose of the visit, in the presence of these witnesses, Attorney Schauss advised Mr. Hall relative to the law pertaining to transfers—the requirements and the effects thereof—and recommended that instead of deeds he should draw a will. An argument resulted, during which Halley Nelson told Attorney Schauss that Hall wanted deeds, not a will, for tax reasons. During the argument Norman Hall made his intent and desires clear to Attorney Schauss, who agreed to draw the deeds as requested. Following a settlement of the argument and the agreement to draw the deeds, the Nelsons seated themselves in the waiting room of the office and Attorney Schauss, Norman Hall and Sandra went into an adjoining room, which apparently was Mr. Schauss's private office. However, they left the door open and some of the conversation could be overheard by the Nelsons.

The trial court's decision to overrule the objection was not in error. The evidence establishes that there was no attempt on the part of Mr. Hall to keep the transaction confidential, and that the Nelsons were not necessary parties to the purpose or objectives of the visit to the attorney's office.

The privilege of the attorney-client relationship is grounded upon the necessity of providing for every client a freedom from any apprehension in discussing the most personal matters with his attorney, and to encourage the client freely to communicate with his attorney without fear of disclosure. However, if the client chooses to make or receive his communication in the presence of a third person, it ceases to be confidential and, therefore, is not entitled

to the protection afforded by the rule. For this reason, we held in State v. Henderson, 156 N.W.2d 700 (N.D.1968), in paragraph 9 of the syllabus:

"Where there is an unnecessary third party present during an attorney-client conversation, any statements made will be considered nonconfidential and not within the ambit of the attorney-client testimonial privilege."

In O'Connor v. Immele, 77 N.D. 346, 43 N.W.2d 649 (1950), we held that the testimony of an attorney was competent where it was clear from the evidence that the client intended that their declarations should not be confidential. The declarations in that case were by a husband and wife, made in the presence of each other concerning their agreement to make reciprocal wills, to the attorney who drafted the wills, and which declarations, it was shown, were thereafter repeated in the presence of each other and other members of the family.

Our holdings appear to be in conformity with the general rule in this respect. See 58 Am.Jur. Witnesses, § 492; 97 C.J. S. Witnesses § 290; 141 A.L.R. 553.

In our opinion there is another reason why the testimony of the attorney and his secretary was admissible in this case. From the record in this case it is clear that Mr. Schauss was not acting as attorney or legal advisor to Mr. Hall. He merely served as a scrivener when he prepared the two deeds in accordance with the instructions given to him by Mr. Hall. It is true that the attorney attempted to give some legal advice but it was not accepted. Under these circumstances, the communications concerning the transaction are not privileged and were properly admitted in evidence.

"An attorney who acted as a mere scrivener in preparing a deed or other instrument in accordance with instructions given to him may testify as to the transaction; and an attorney who acts merely as a notary in taking the acknowledgment of a deed or other instrument may testify as to communications made to him at the time or the attending circumstances. Where, however, an attorney is employed in his professional capacity he cannot testify as to communications with respect to a deed or other instrument, which he prepared for his client in the course of such employment; so instructions given by a client to an attorney relating to papers about to be drafted by the latter, which include a statement of the purpose to be accomplished, are privileged. An attorney employed in the preparation of an instrument who acted as an attesting witness thereto may testify as to the transaction, at least as to matters which a subscribing witness as such may be called on to testify to; but if he is employed as a confidential adviser in the preparation of the instrument, matters which came to his knowledge from his client in the preparation of the paper are privileged." 97 C.J.S. Witnesses, § 280.

See also, 58 Am.Jur. Witnesses, § 481.

In a report of the Supreme Court of the Territory of Dakota, that court construed Section 499(1) of the Code of Civil Procedure, 1877. This section of the territorial code was adopted by this state upon attaining statehood and has continued in effect without change. It is now codified as Section 31–01–06, N.D.C.C., which section is set forth above. The territorial supreme court, in the case of O'Neil v. Murry, 6 Dak. 107, 50 N.W. 619 (1888), held that:

"Under sub. 1, § 499, C.C.Pro., providing that 'an attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment,' an attorney employed for the purpose of drawing certain conveyances (the execution of which had been determined upon before consulting him) may testify as to what was said and done at the time

of their execution as bearing on an issue of their being absolute, or conditional merely." Headnote No. 2, 6 Dak. 107, 50 N.W. 619.

The construction placed upon the statute by the territorial court is equally applicable today and is in harmony with the general law.

It is our conclusion that the trial court did not err in overruling the objection and permitting the testimony of Attorney Schauss and his secretary pertaining to the transaction. In its brief the Hall Estate states that the testimony of Attorney Schauss and his secretary was, without question, the most damaging testimony presented. With this conclusion we agree. It sustains the trial court's finding that on October 24, 1963, Norman Hall, as grantor, signed, executed and unconditionally delivered two deeds to Sandra, granting and conveying to her the property in issue here; that the delivery of these deeds to Sandra was absolute and not made conditionally.

 The Hall Estate has specified that the court erred when it denied its motion to strike Sandra's testimony at the trial. Sandra was called as a witness by her attorney. An objection was made before she testified that any material testimony touching in any way upon the issues in this action would be inadmissible because such testimony would involve transactions within the definition of that term as used in Section 31–01–03, N.D.C.C. (dead man's statute), and, for the further reason, that any testimony not coming within the definition of a transaction would be irrelevant, immaterial and incompetent. The court refused to rule on the general comprehensive objection and asked counsel to specifically object to the questions as they were asked.

Sandra was then examined and testified as to her name; her birthdate; place of birth; the geographical area in which she grew up; her familiarity with the land in question; her age when she was first on the land; her mother's maiden name and married name; the fact that she did not remember her biological father; the date of her mother's marriage to Norman Hall and Sandra's age at that time; and the fact that she had lived with her mother and Norman Hall after their marriage on the land in issue in this action. She also was permitted to testify that her mother had no other children and that Norman Hall had no children. She testified as to the date of her mother's death; the history of the ownership of the property in issue; and the fact that she does not have possession of the deeds and, to the best of her knowledge, they have not been found and are lost.

Objections were made to most of the questions propounded to elicit the above information on the grounds of irrelevance and immateriality, and were overruled. Although there may be some question as to the relevancy and materiality of the answers given to some of the questions, we are unable, however, to see how this testimony is in any way prejudicial to the Hall Estate. Three questions were asked of Sandra which were objected to on the ground that the answers would be inadmissible under the provisions of Section 31–01–03, N.D.C.C. (dead man's statute), and these objections were sustained.

The motion to strike was made at the close of the trial and was premised on the claim that counsel had, at no time, in any way, linked her testimony up in any manner to make it material.

In an appeal the appellant has the burden of not only showing error but that the error was prejudicial. Zimmerman v. Bellon, 153 N.W.2d 757, 29 A.L.R.3d 1431 (N.D.1967).

In this case there is merely a claim of error in the admission of the testimony and a refusal to strike, but no showing whatever has been made to show prejudice, and we believe there is none.

 The next specification we will consider has to do with the exclusion of evidence. It is the contention of the Hall Estate that it was error for the trial court

to exclude the testimony of three persons concerning acts and declarations of Norman Hall subsequent to the alleged delivery of the deeds.

The Hall Estate called G. Hochhalter who testified that he was well-acquainted with Norman Hall and had discussed with him a will or other disposition of his property on more than one occasion. He testified that he accompanied Mr. Hall on a visit to a Bismarck lawyer to discuss this matter, he believed, in 1968. He testified they went to see Attorney Max Rosenberg but, because he was not in, they talked with his partner, Bill Lucas. He was then asked the question: "Can you tell me what was discussed in relation to any real property of Norman Hall." An objection was made on the grounds it was immaterial and hearsay as to any conversation in 1968 outside the presence of the plaintiff. The court sustained the objection on the ground that statements of a grantor are admissible when such statements are in support of a deed but not when they are against it. It was agreed by counsel that the answer, if given, would be against it. An offer of proof was made as follows:

"* * * And the offer of proof I would like to make, first, through Mr. Hochhalter and also through Mr. Lucas, who was to be called as a witness. Testimony will be offered to show that the decedent, Norman Hall, acknowledged that he had executed a quitclaim deed to the premises in question to Sandra C. Schliter but denied having delivered it, and at the same time denied that the same had ever left his possession, that he advised Mr. Hochhalter and Mr. Lucas that he had destroyed the same.

"Further, the testimony would indicate that he stated the desire that his real property pass to the churches involved here and that from that conversation the first draft of his last will and testament, which has been admitted to probate, was prepared.

"The offer of proof goes further, in that Milton Higgins would be called and,

through him, an exhibit marked and introduced, which was a will prepared by Mr. Higgins for Norman Hall in 1967, which document specifically recites that he was giving fourteen quarters of land to only two of the three churches which ended up in the third will.

"This testimony is all of actions, declarations, and expressions subsequent to execution, which we feel have evidentiary purpose in showing, one, that the deed was not delivered; or, two, that if delivered, intent was not to pass title as has been alleged by the Plaintiff. And we would seek to couple these declarations and statements with conduct of the party, which, again, is consistent with that intent not to pass or vest title in the Plaintiff through execution and purported delivery of some instruments."

The trial court denied the offer of proof. It was stipulated and agreed, by and between the parties, that the offer of proof be considered the same as if the Hall Estate had also called Mr. Higgins and Mr. Lucas and then asked them the same question which was objected to when asked of Mr. Hochhalter.

It is argued that the offer of proof was made for the purpose of showing, and the proffered evidence, if received, would tend to establish, that the deeds were not delivered, or that, if the deeds were delivered, the intent of Norman Hall was not to pass title to Sandra.

The offer of proof admits that the deeds conveying the property in question to Sandra were, in fact, drawn and executed by Norman Hall.

The trial court made an express finding that the delivery of the deeds by Norman Hall to Sandra was absolute and not made conditionally, and concluded that title passed upon delivery on October 24, 1963. The evidence clearly supports this finding and the conclusion. Attorney Schauss testified that he had practiced law in this state since 1947; that on October 24, 1963,

four people came to his office, one of whom was Norman Hall, another was Sandra. With respect thereto, he testified:

"The four people came to my office and Mr. Hall introduced himself and said that he wanted to talk to me. And my recollection is that all four of them were present, and Mr. Hall advised me that he wished me to prepare some deeds for property he had in Burleigh and McLean County."

He testified that Mr. Hall wanted the deeds to run to Sandra Schliter, whom he described as being the daughter of his deceased wife, and that:

"When he told me that he wanted me to prepare a deed, I advised him that if a deed were delivered, it would have the effect of transferring the title to the property to Sandra. I advised him if it weren't delivered, it would have, or it would be, of no legal effect. He stated that he wanted to, that he understood that and wanted to transfer the title to the land to Sandra Schliter."

With respect to the procedure in the method of drawing a deed, he testified:

"Well, I roughed out a deed on my own typewriter, in my own type of typing—I roughed out a deed covering the land, I think, in McLean County, and then on the back typed in instructions for the second deed in Burleigh County."

He testified that he had taken descriptions of the land from a paper given to him by Mr. Hall, which paper was a leaf from a calendar which contained the legal descriptions written on the back of it. He brought with him into court the roughed-out deed and the calendar page containing the land descriptions on the back. They were admitted as exhibits in evidence. He testified that he gave the roughed-out deed, containing the descriptions of the land in both counties, to his secretary. She then prepared two deeds and brought them to him in his office. These deeds named

Norman Hall as the grantor and Sandra C. Schliter as the grantee and recited that, for One Dollar, and other valuable considerations, he, Norman Hall, transfers title to Sandra to the property described therein. There were two deeds; one covering the land described as being in McLean County, and the other the land described as being in Burleigh County. He testified that after the deeds were returned to him by his secretary he went over them with Mr. Hall, who found them to be correct, and then Mr. Hall signed the deeds and Attorney Schauss notarized them as notary public. With respect to delivery, he testified:

"Well, I discussed the fact that the deeds would not be valid unless—would not be valid as transferring title at that time unless they were delivered. If they were delivered, they would have the effect of transferring title as of the time of that delivery."

And that then:

"I handed them to Mr. Hall, and he handed them to Sandra Schliter."

He testified that Mr. Hall physically put the two deeds into her hand. He did not recall any discussion between them at that particular time but Mr. Hall had indicated that he wanted the deeds to be made immediately effective so he handed them to him for the purpose of making delivery. On cross-examination Mr. Schauss explained the reason for having recommended to Mr. Hall that he draw a will, as follows:

"When Mr. Hall told me he wanted to draw these deeds and transfer this land to Sandra Schliter, I had discussed the matter of delivery with him and advised him of the possibility of someone contesting the matter of the deeds and the validity of the deeds, and I suggested that I also draw the will in order to cover the possibility that the deeds might later be attacked."

In relation to the argument or disagreement that occurred in the office, as related by the testimony of Mr. and Mrs. Halley

Nelson, Mr. Schauss, on cross-examination, in response to questions, testified:

"When I mentioned drawing a will instead of drawing a deed, Mr. Nelson indicated that he didn't feel that this was necessary and that they shouldn't do that, draw the will. And I then lost my temper to some extent and got out a couple of blank quitclaim deeds and suggested to Mr. Hall that he had a man with him who knew how things should be done and he should take those and have him handle it, or words to that effect."

Further, on cross-examination, he testified:

"My understanding from my conversation with Mr. Hall was that it was his intent to presently transfer title to Sandra, but that he intended to keep farming the land."

He also testified, on cross-examination, that Mr. Hall returned to his office:

"Approximately a year later, and that time is just an estimate, Mr. Hall came to my office and asked me if anyone else had access to his file. And I told him no. And he indicated that he just wanted to know if anyone else had access to his file except he, and that was all the discussion."

In addition to the testimony of Attorney Schauss, Beverly Torsey was called as a witness on behalf of Sandra. She was Attorney Schauss's secretary on October 24, 1963; however, she was not employed by the attorney at the time of trial. She testified that she had been a legal secretary for approximately six years at that time; that she was present and recalled the transaction in question. She was present at the discussion between Mr. Hall and Mr. Schauss in regard to the drawing of quitclaim deeds, which discussion was participated in by Mr. Nelson. She testified that when these four people came in, Mr. Hall told Mr. Schauss "that he wanted his property to go to his stepdaughter." She testified as to the argument which resulted when Mr. Schauss recommended that a will be drawn, which argument was participated in by Mr. Nelson to the extent that he used "pretty foul language, and at that point Mr. Schauss came out to the files and told all of them that he would give them blank forms and they could have the attorney with them do the work." The attorney with them was explained as being Mr. Nelson, Sandra's uncle. She was asked what happened following the argument and answered:

"A. Sandra—I could see she looked very embarrassed. She asked Mr. Hall if he definitely wanted to do this, and he said that he did, that he wanted her to have the property, and he asked Mr. Schauss if he would prepare the deeds.

"Q. Then what happened?

"A. Then Mr. Schauss explained to him that if he had done this, he understood that the property would be his stepdaughter's, and he said he understood and he wanted it this way.

"Q. Who is the 'he' that understood?

"A. Mr. Hall.

"Q. Then what happened?

"A. Then Mr. Schauss said he would. He typed a rough draft at his desk, or on his typewriter, which is beside his desk. He brought it out to me to type in the right form, with the descriptions.

"Q. Is this the time that you saw the documents labeled 1 and 2? [These documents are the roughed-out deed form and the calendar sheet with the land descriptions on the back.]

"A. Right.

"Q. Did you then prepare two separate deeds?

"A. Yes.

"Q. What was the difference in them?

"A. They were in two different counties.

"Q. In other words, the legal descriptions were different? One was all in Burleigh County and the other was all McLean County property?

"A. Right.

"Q. After you prepared the deeds, what was done with them?

"A. I took them back to Mr. Schauss. He had Mr. Hall read them over. He went over the documents with him, and this was what Mr. Hall wanted.

"MR. CONMY: Again, can you be specific as to who said what, what was done, rather than conclusions?

"A. I returned the deeds to Mr. Schauss. Mr. Schauss had Mr. Hall look the deeds over. He—Mr. Schauss—went over the documents with Mr. Hall at that time. Mr. Hall said this is what he wanted to do. Mr. Schauss then had Mr. Hall sign the deeds.

"MR. CONMY: May I interrupt for a second to ask a question.

"Q. (by Mr. Conmy) Where were you at this time?

"A. At this point I was standing in the doorway.

"Q. Watching?

"A. Right.

"Q. (by Mr. Bucklin) Then what happened, Mrs. Torsey?

"A. Mr. Hall signed the deeds. Mr. Schauss took the acknowledgments, and then, if I do remember correctly, I believe he had Mr. Hall go through the formality of handing them to her, the stepdaughter, telling her that the property was now hers.

"Q. Do you recall actually a physical, manual delivery, a hand delivery of the deeds?

"A. Yes, I saw this.

"Q. Where did the deeds go, from whom to whom?

"A. Mr. Hall handed the deeds to his stepdaughter. She had them in her hands. Now, when she left, I think she had the deeds with her, but at that point I am not certain as to who walked out with them.

"Q. Did you then see a physical, manual, handing of the deeds to the stepdaughter?

"A. Right.

"Q. By Norman Hall?

"A. Right.

"Q. Did he say anything at that time?

"A. Yes, he told her that the property was now hers.

"Q. And after that, everyone left the office?

"A. Yes. Mr. Hall, he thanked Mr. Schauss, and he apologized for the uncle's behavior, and then everyone did leave the office."

Grace Nelson, who was present at the time of the transaction in Attorney Schauss's office, testified that she saw the deeds again the next day, at which time she was in Sandra's bedroom. She testified:

"Well, Norman rapped at the door, and then he told Sandra that, being she was going back to school and wouldn't have a place for them, he would take the deeds and he would put them in his little gray lockbox he had in his bedroom, so she would know where they were, and then if she ever wanted them or needed them, she would know."

She further testified:

"Then Sandra went over and took them out from under her pillow and gave them to him."

A grant takes effect so as to vest the interest intended to be transferred upon its delivery by the grantor. Section 47–09–06,

N.D.C.C. A grant cannot be delivered conditionally but delivery to the grantee is necessarily absolute and the instrument takes effect upon delivery, discharged of any condition on which the delivery was made. Section 47–09–07, N.D.C.C. Thus, where the grantor makes a manual delivery to the grantee of a deed, absolute in form, intending to part with all authority and dominion over the instrument, the delivery is absolute and title passes immediately in accordance with the terms of the deed, notwithstanding any intention or understanding to the contrary between the parties. Accola v. Miller, 76 N.W.2d 517 (N.D. 1956); Shuck v. Shuck, 77 N.D. 628, 44 N.W.2d 767 (1950); Arhart v. Thompson, 75 N.D. 189, 26 N.W.2d 523 (1947).

We are satisfied, as was the trial court, that the evidence, by a great preponderance, unequivocally establishes unconditional delivery of the deeds by Norman Hall to Sandra on October 24, 1963.

The offer of proof and the testimony preceding it establish that the declarations which were offered were not made in the presence of Sandra, the grantee. They are, therefore, purely hearsay and are inadmissible unless they fall within some exception to the hearsay rule. McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 156 A.L.R. 1328 (1944). We have held that statements and declarations made by a grantor after delivery of a deed are admissible in a suit to enforce the title thereunder where such statements support the deed but not where they are against it. Silbernagel v. Silbernagel, 79 N.D. 275, 55 N.W.2d 713 (1952); Arnegaard v. Arnegaard, 7 N.D. 475, 75 N.W. 797 (1898).

The Hall Estate has also specified that it was error for the trial court to refuse to give a requested instruction relative to the question of whether the deed was delivered. Because the instruction was not given, the Hall Estate contends that the refusal was prejudicial and a new trial should be granted. We find that there is no prejudicial error in this particular. There is no right to have a jury trial in an action to quiet title to land. An action to quiet title is purely equitable and the verdict of a jury is advisory only. O'Neil v. Tyler, 3 N.D. 47, 53 N.W. 434 (1892). In all actions not triable by right by jury, the court, on motion or its own initiative, may try any issue with an advisory jury. Rule 39(c), N.D.R.Civ.P. The findings state:

"Pursuant to Rule 39(c) of the Rules of Civil Procedure, the Court sat with an advisory jury, which jury returned its advisory verdict to the Court * * *"

The consent required by Rule 39(c), N.D.R.Civ.P., to give the verdict the same effect as if trial by jury had been a matter of right, was not given. Following the return of answers to the special interrogatories submitted to the jury, the trial court stated:

"I accept the Jury's findings of fact and verdict in each instance, ratify their findings, and adopt such findings as findings of the Court.

"Since this is a case in which the Jury is acting in an advisory capacity, having adopted your findings, which I believe are supported by the preponderance of the evidence, I must now make certain conclusions of law."

Where the trial court has expressed its conviction that the issues submitted to an advisory jury have been correctly decided, we will not reverse because of possible error in effecting its deliberations. If there was anything improper in connection with the instructions, it is immaterial in view of the fact that the trial court, in addition to adopting the answers of the advisory jury, also found the same facts on the evidence in its written findings of fact.

"In an equity case, or where the verdict is only advisory, error in instructing the jury is not reversible, especially where the court exercised its independent judgment in making its own findings of fact. The review on appeal includes both the law and the facts, and, of course, where

the verdict was manifestly for the right party the error is immaterial." 5A C.J.S. Appeal and Error § 1772.

See also, 5 Am.Jur.2d, Appeal & Error, § 816, at 258.

◼ In five separate specifications of error the Hall Estate specifies that Findings of Fact Nos. 6, 7, 8, 9 and 11 are not proper findings of fact because, according to the specifications, some of these paragraphs contain a conclusion of law and others contain merely an argument of counsel for the plaintiff. No argument or citation of authority is set forth in the brief in support of these arguments. We have reviewed the findings referred to in these specifications and find no grounds for reversal on the basis that these findings contain the surplusage complained of.

"Mere errors of form in findings or conclusions or irregularity in practice in making them will not ordinarily constitute ground for reversal. The rule has been applied to save judgments, otherwise unobjectionable, from being avoided for such matters as clerical or typographical errors, inadvertent misstatements of details having no bearing on the merits, inaccurate use of terms the meaning of which clearly appears from the context, or obvious and correctable irregularity in failing to mark the various propositions.

"Likewise, the rule has been applied with respect to computation of damages by a method which, although erroneous, does not substantially affect the result, and impropriety in grouping or in separating findings or conclusions, which does not obscure their sense or affect their meaning, as well as irregularities in the order of service, signature, and filing, or in respect of the amount of time intervening between such acts, or failure to serve a copy of the findings. Noncompliance with merely directory provisions of statutes relating to findings will not be noticed on appeal where the findings are proper and the departure from the prescribed practice is harmless." 5B C.J.S. Appeal and Error § 1788.

◼ Lastly, it is argued that the findings of fact do not support the conclusions of law because there is no finding that Norman Hall intended to transfer title to the real estate to Sandra. It is argued that the findings only establish a physical delivery of the deeds and that the trial court has not found, as a fact, an intention on the part of the grantor to transfer a present interest in the real estate to be operative as of the date of the transfer. We disagree. We believe that Finding No. 11, although probably not in the most clear language, finds facts upon which the court concluded that there was a transfer of property effective as of the date of the physical delivery.

"The land described in these Findings of Fact had been conveyed by Norman Hall, as grantor, during his lifetime to Sandra C. Schliter. Even if the evidence be viewed as showing some sort of understanding or agreement between Norman Hall and Sandra C. Schliter that Norman Hall would use the land during his lifetime, this did not prevent the transfer of the title to the property, and that transfer was a valid inter vivos transfer by the grantor before his death. The real estate is not a part of the estate of Norman Hall and is not subject to probate or administration in probate."

In addition to reviewing the specifications of error in the light of the arguments presented on this appeal, we have also reviewed the evidence and conclude that it substantially supports the jury's answers to the special interrogatories and the trial court's findings of fact for the reasons hereinbefore stated.

The judgment is affirmed.

STRUTZ, C. J., and ERICKSTAD, PAULSON, and KNUDSON, JJ., concur.