Martin WHETHAM and Dixie Whetham, Plaintiffs,

and

Dixie Whetham, Plaintiff and Appellant,

v.

BISMARCK HOSPITAL, a corporation, Defendant and Respondent.

Civ. No. 8794.

Supreme Court of North Dakota.

May 1, 1972.

Conmy, Conmy, Rosenberg, Lucas & Olson, Bismarck, for plaintiff and appellant.

Zuger, Bucklin & Zuger, Bismarck, for defendant and respondent.

ERICKSTAD, Judge.

Martin and Dixie Whetham, the parents of Tami Lynn, a child born to them in the Bismarck Hospital on the 28th day of July 1970, commenced an action to recover from the Bismarck Hospital a judgment of $100,000. They assert that shortly after Dixie's admission to the Bismarck Hospital, Tami Lynn was born, and that in the process of bringing Tami Lynn to Dixie's hospital bed an employee of the Hospital, in Dixie's presence, dropped her onto the tiled floor of the hospital room. They assert further that Tami Lynn struck her head upon the floor with great force and violence, fracturing her skull, and that this resulted from the careless and negligent handling of the child by the employee; that as a direct and proximate result of that negligence, Dixie was forced helplessly to watch her daughter fall to the floor and to hear the sound of the impact; that as

a direct and proximate result of such negligence, Dixie suffered a severe emotional and mental shock, for which she now seeks recovery in money damages.

The Whethams also ask for damages resulting from the additional medical expenses thereafter required to be expended for Tami's care and for the prolonged hospitalization of the mother while the child received this care.

The trial court, on a motion for summary judgment, dismissed that part of the complaint which asked for damages arising out of the suffering caused Dixie from the emotional and mental shock of observing her daughter fall to the floor.

Dixie has now appealed to this court from the judgment entered on the 16th day of August 1971 dismissing that part of the complaint. The complaint asserts that no claim is made on behalf of Tami Lynn for her injuries, for the reason that the full residual effects of her injuries are not yet known.

Because the Hospital has moved for a dismissal of the appeal on the ground of delay in perfecting the appeal, we must first consider that motion before we reach the merits of the appeal.

The Hospital cites in support of its motion Rules 7, 13, 21, 24, and 31 of Rules of Practice in Causes in the Supreme Court of North Dakota. It contends that notwithstanding that the case is now ready to be heard before our court, the briefs having been filed and the record settled, the case should be dismissed because Dixie failed, among other things, to file her brief within the time provided for in our Rules and failed to secure a settled statement of the case within that period.

Had her brief been filed within the required period and the statement of the case settled within that time, this case could have been heard only one month earlier.

We are inclined to deny the motion and settle the matter on the issues raised on the

merits, consistent with action we took as recently as January 12, 1972, when we by minute order denied a motion to dismiss an appeal in the case of Bolyea v. First Presbyterian Church, N.D., 196 N.W.2d 149.

In the syllabus of a recently published opinion, we said:

"Because determination of an appeal upon the merits is favored, and because this court has complete discretion under its rules to determine motions for dismissal of appeals based upon undue delay, and since the delay in the instant case has not resulted in inconvenience, detriment or prejudice to the respondents, and since the record, including a settled statement of the case, was received by this court, and the briefs were served and filed with this court prior to the date of the oral argument upon the motion for dismissal, the motion is denied." Hogan v. Knoop, Syllabus ¶ 1, 191 N.W.2d 263, 264 (N.D.1971).

The procedural facts in this case are similar to the procedural facts in *Hogan*. Accordingly, we deny the motion for dismissal and proceed now to a determination of this appeal upon its merits.

■ We must now decide whether Dixie, as the mother of Tami Lynn, may recover damages for emotional and mental shock suffered as a result of seeing Tami Lynn dropped from the arms of an employee of the Hospital onto the tiled floor of Dixie's hospital room.

There are two leading cases in the State of California on whether liability may be predicated on fright or nervous shock (with consequent bodily injury) induced solely by the plaintiff's apprehension of negligently caused danger or injury to a third person.

The first case is that of Amaya v. Home Ice, Fuel & Supply Co., 59 Cal.2d 295, 29 Cal.Rptr. 33, 379 P.2d 513 (1963). In *Amaya*, Justice Schauer, speaking for the majority of the California Supreme Court,

after reviewing the law of California and the other States of the United States, noting the development of the law as contained in the Restatement of Torts, the administrative difficulties and the socio-economic and moral factors, concluded that under the circumstances recovery was not permitted.

Justice Schauer pointed out that there must be a stopping point to the liability of a negligent defendant and, quoting Professor Prosser, said:

" 'It is still unthinkable that any one shall be liable to the end of time for all of the results that follow in endless sequence from his single act. Causation cannot be the answer; in a very real sense the consequences of an act go forward to eternity, and back to the beginning of the world.' (Prosser, Palsgraf Revisited (1953) 52 Mich.L.Rev. 1, 24.)" Amaya v. Home Ice, Fuel & Supply Co., *supra*, 29 Cal.Rptr. 33, 44, 379 P.2d 513, 524.

He then explained why he thought it unthinkable that anyone should be liable to the end of time.

"First, to the extent that the law intervenes in any area of human activity and declares that for certain consequences of that activity the actor shall be held civilly liable in damages, both the individual actor and society as a whole feel the effects of the restraint—a psychological effect in the form of a lessening of incentive, and an economic effect in the form of the cost of insurance necessary to enable the activity to continue. Yet it is recognized that no activity could survive an unlimited progression of such effects. Accordingly, when the general social utility of an activity is deemed to outweigh the particular interests with which it may clash, important policy reasons dictate that some limits be set to liability for its consequences. How do these considerations affect our problem? The law, both in California and in the many other jurisdictions which

have passed on the question, now provides, as has been shown, that an actor who is merely negligent is not liable to one who claims injury through fright or shock induced by conduct directed not to the latter but to a third person. Thus, in cases where the defendant's conduct involved negligent driving of a motor vehicle the courts conclude that to extend liability to spectators who were not themselves in danger 'would, in our opinion, place an unreasonable burden upon users' of highways.' (Cote v. Litawa (1950, N.H.), supra, 96 N.H. 174, 71 A.2d 792, 795 [6], 18 A.L.R.2d 216; accord, Resavage v. Davies (1952, Md.), supra, 199 Md. 479, 86 A.2d 879, 883 [3–5]; Waube v. Warrington (1935, Wis.), supra, 216 Wis. 603, 258 N.W. 497, 501 [2–4], 98 A.L.R. 394.) As the industrial society in which we live becomes still more complex and the use of the streets and highways and airways increases, a certain percentage of accidents therefrom appears to become statistically inevitable. There will be losses, and our present system of insurance attempts to compensate for them, and, of course, to spread the cost of compensation over those who do not, as well as those who do, cause such losses. But could that system— imperfect at best—adequately and fairly absorb the far-reaching extension of liability that would follow from judicial abrogation of the rule now before us? And what of the many other activities of everyday life that are either uninsurable or customarily uninsured, yet may well give rise to the type of 'spectator injury' here alleged? We conclude, rather, that the social utility of such activities outweighs the somewhat speculative interest of individuals to be free from the risk of the type of injury here alleged.

"The second reason for seeking a stopping point to the negligent defendant's liability is a related one. As long as our system of compensation is based on the concept of fault, we must also weigh 'the moral blame attached to the defendant's conduct' (Biakanja v. Irving (1958), supra, 49 Cal.2d 647, 650 [1], 320 P.2d 16, 65 A.L.R.2d 1358). Here is felt the difference between the social importance of conduct that negligently causes harm and conduct that is intended to do so. It is often said that in the latter case the defendant will be held liable for a broader range of consequences because, as the consequences are intended, they are the more 'foreseeable.' But in many intentional tort cases the defendant has been held liable under this reasoning for consequences far beyond those which he actually intended. (See Bauer, The Degree of Moral Fault as Affecting Defendant's Liability (1933) 81 U.Pa. L.Rev. 586, 588–592.) It follows that, once more, 'foreseeability' is not the real answer. Rather, the increased liability imposed on an intentional wrongdoer appears to reflect the psychological fact that solicitude for the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes." Amaya Home Ice, Fuel & Supply Co., supra, 29 Cal.Rptr. 33, 44, 45, 379 P.2d 513, 524, 525.

It should be noted that Justice Peters wrote a dissent which was joined in by Justices Gibson and Peek.

In 1968, only five years after Amaya, and after changes in the membership of the court, the California Supreme Court overruled Amaya in Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912.

Justice Tobriner, speaking for the majority in Dillon, believing that the difficulties of adjudication should not frustrate the principle that there be a remedy for every substantial wrong and yet realizing that potential infinite liability should be limited, concluded that the law of torts holds a defendant amenable only for injuries to others which to the defendant at the time were reasonably foreseeable. In noting that the court was dealing with a case in which the plaintiff suffered a shock

which resulted in physical injury, and confining its opinion to that case, the court said:

"In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." Dillon v. Legg, *supra*, 69 Cal.Rptr. 72, 80, 441 P.2d 912, 920.

After laying down these guidelines, the court said that it would determine whether the accident and harm were reasonably foreseeable in light of the cited factors.

Applying the aforementioned factors, Justice Tobriner concluded that the presence of all the factors indicated that the plaintiff had alleged a sufficient prima facie case. He quoted Dean Prosser as follows:

"'[W]hen a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and will suffer serious shock.' (Prosser, The Law of Torts, supra, at p. 353. See also 2 Harper & James, The Law of Torts, supra, at p. 1039.)" Dillon v. Legg, *supra*, 69 Cal.Rptr. 72, 81, 441 P.2d 912, 921.

Justice Burke, dissenting in *Dillon*, had this to say:

"The majority, obviously recognizing that they are now embarking upon a first excursion into the 'fantastic realm of infinite liability' (*Amaya*, at p. 315 of 59 Cal.2d, 29 Cal.Rptr. 33, 379 P.2d 513), undertake to provide so-called 'guidelines' for the future. But notwithstanding the limitations which these 'guidelines' purport to impose, it is only reasonable to expect pressure upon our trial courts to make their future rulings conform to the spirit of the new elasticity proclaimed by the majority.

"Moreover, the majority's 'guidelines' (ante, 69 Cal.Rptr. pp. 80, 81, 441 P.2d pp. 920, 921) are simply a restatement of those suggested earlier by Professor Prosser (Prosser, Torts, 2d ed., 1955, p. 182); they have already been discussed and expressly rejected by this court in *Amaya* (59 Cal.2d pp. 312–313, 29 Cal. Rptr. 33, 379 P.2d 513). Upon analysis, their seeming certainty evaporates into arbitrariness, and inexplicable distinctions appear. As we asked in *Amaya*: What if the plaintiff was honestly *mistaken* in believing the third person to be in danger or to be seriously injured? What if the third person had assumed the risk involved? How 'close' must the relationship be between the plaintiff and the third person? I. e., what if the third person was the plaintiff's beloved niece or nephew, grandparent, fiancé, or lifelong friend, more dear to the plaintiff than her immediate family? Next, how 'near' must the plaintiff have been to the scene of the accident, and how 'soon' must shock have been felt? Indeed, what is the magic in the plaintiff's being actually present? Is the shock any less real if the mother does not know of the accident until her injured child is brought into her home? On the other hand, is it any less real if the mother is physically present at the scene but is nevertheless unaware of the danger or injury to her child until after the accident has occurred? No answers to these questions are to be found in today's majority opinion. Our trial courts, however, will not so easily escape the burden of distinguishing between litigants on the basis of such artificial and

unpredictable distinctions." Dillon v. Legg, *supra*, 69 Cal.Rptr. 72, 86, 441 P.2d 912, 926.

The writer of an article in 29 A.L.R.3d, published in 1970, discussing the right of a bystander to recover damages in a negligence action for his fear that a third person will be injured or for his mental anguish at witnessing such injury, points out that there is a division among the courts, as illustrated by recent decisions from New York and California.

"In determining this question, the courts have expressed several views, ranging from a traditional view that such damages are generally not recoverable, to the view that such damages are recoverable if the plaintiff's emotional disturbance was reasonably foreseeable; this dichotomy has recently been graphically shown by decisions from the highest courts of New York and California.

"Those courts which have subscribed to the traditional view that a recovery of damages in a negligence action may generally not be had for a plaintiff's fear of injury to a third person, or his shock of mental anguish at witnessing such an injury, occasioned by a defendant's negligence, have evidently based their view on the consideration that the injuries suffered by the plaintiff bystander were too remote from the defendant's negligent act, or that there was no duty owed by the defendant to the plaintiff bystander to prevent him from being frightened by what he had seen. As factors especially pertinent in its finding that the defendant owed no duty to the plaintiff bystander, the court in Tobin v. Grossman (1969) 24 NY2d 609, 301 NYS 2d 554, 249 NE2d 419, cited the problem of foreseeability of the injury to the plaintiff bystander, the problem of the defendant's unlimited liability, the factor of an unduly burdensome liability, and the difficulty of obtaining any reasonable circumscription, within tolerable limits required by public policy, of a rule creating liability." 29 A.L.R.3d 1345.

"The furthest departure from the tradditional view has been taken by some cases which have stated that a plaintiff's fear, fright, or the like over a third person's peril occasioned through a defendant's negligence may properly be the subject of damages where the plaintiff's emotional disturbance was or should have been reasonably foreseeable to the defendant. The explanation for this radical departure has been most forcefully given in Dillon v. Legg (1968) 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 29 ALR3d 1316. Stating that fears of fraudulent and indefinable claims do not justify a denial that the defendant owes any duty to the plaintiff in such a situation, the court said that a defendant is amenable only for injuries to others which to the defendant at the time were reasonably foreseeable; and that in such cases seeking recovery of damages for emotional disturbance over the peril of a third person, if the plaintiff did not suffer physical impact, foreseeability should be determined by the proximity of the plaintiff to the accident, the method by which the plaintiff was made aware of the accident, and the relationship of the plaintiff and third person." 29 A.L.R.3d 1346.

Also pertinent is what the writer has to say about the treatment given this subject by Restatement of Torts 2d.

"In § 313(1) of the Restatement of Torts 2d, it is stated that if the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm; in § 313(2) it is stated that the aforementioned rule has no application to illness or bodily harm of another which is caused by

emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other. In the comment to § 313(2) it is observed that the rule of § 313(1) applies only where the negligent conduct of the actor threatens the other with emotional distress likely to result in bodily harm because of the other's fright, shock, or other emotional disturbance, arising out of fear for his own safety, or the invasion of his own interests, and it has no application where the emotional distress arises solely because of harm or peril to a third person, and the negligence of the actor has not threatened the plaintiff with bodily harm in any other way. Thus, by way of illustration, the Restatement points out that where the actor negligently runs down and kills a child in the street, and its mother, in the immediate vicinity, witnesses the event and suffers severe emotional distress resulting in a heart attack or other bodily harm to her, she cannot recover for such bodily harm unless she was herself in the path of the vehicle, or was in some other manner threatened with bodily harm to herself otherwise than through the emotional distress at the peril to her child." 29 A.L.R.3d 1347, 1348.

■ Having considered the arguments expressed in the California decisions and the New York decision and noted the view most recently expressed in the Restatement of Torts 2d, we conclude that the trial court was correct in the instant case in dismissing that part of the complaint which sought to recover damages for the plaintiff's mental anguish at witnessing her daughter's injury negligently caused by an employee of the Hospital. It is our view that the plaintiff herein could recover only if the defendant's negligent act had threatened the plaintiff herself with harm or placed her within what is termed the zone of danger. The complaint contains no facts

upon which such a contention could be supported.

For the sake of future litigation, we think it important to note that we are today not adopting the "impact rule", which is to the effect that there can be no recovery for the consequences of fright and shock negligently inflicted in the absence of contemporaneous impact.

The Supreme Court of Pennsylvania in Niederman v. Brodsky, 436 Pa. 401, 261 A.2d 84 (1970), when considering whether it should abandon the impact rule, noted the trend of the appellate courts to abandon the rule.

"1. Since 1929 *every other jurisdiction* which has considered the issue, has either abandoned the rule or refused to adopt it. See Comment, Injuries from Fright Without Contact, 15 Cleve.-Mar.L.Rev. 331, 337 (1966).

"A total of thirty-one jurisdictions have considered the impact rule. Of these 22, and perhaps 23 (depending on the resolution of the current confusion in Ohio) have rejected the requirement of impact. See Restatement, Torts (Second) § 436, Reporter's Notes; Robb v. Pennsylvania Railroad Company, 210 A.2d 709 (Del.1965); Falzone v. Busch, 45 N.J. 559, 214 A.2d 12 (1965); Savard v. Cody Chevrolet, Inc., 126 Vt. 405, 234 A.2d 656 (1967)." Niederman v. Brodsky, *supra*, 261 A.2d 84, 85 n.

Having examined the arguments in support of the old impact rule and having concluded that continued adherence to the rule made little sense, the Pennsylvania Supreme Court, two years after Dillon v. Legg, *supra*, adopted the zone-of-danger test.

"We today choose to abandon the requirement of a physical impact as a precondition to recovery for damages proximately caused by the tort in only those cases like the one before us where the plaintiff was in personal danger of physi-

cal impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact." Niederman v. Brodsky, *supra*, 261 A.2d 84, 90.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

STRUTZ, C. J., and PAULSON, KNUDSON, and TEIGEN, JJ., concur.