STATE OF NEVADA, Appellant and Cross-Respondent, v. CHRYSTAL EATON, Respondent and Cross-Appellant.

No. 15158

December 10, 1985 710 P.2d 1370

[Rehearing denied April 24, 1986]

*Brian McKay,* Attorney General, *Steven F. Stucker,* Deputy Attorney General, Carson City, for Appellant and Cross-Respondent.

*Erickson, Thorpe, Swainston & Cobb, Ltd.,* Reno, for Respondent and Cross-Appellant.

# OPINION

By the Court, MOWBRAY, J.:

A jury awarded respondent Chrystal Eaton $40,472.65 for personal injuries and $100,000 for the wrongful death of her infant daughter, Amber, arising out of a car accident.[1] Chrystal's husband and Amber's father, Byron Ronald Eaton (Ron), was driving the family car when it struck the rear of a truck. Ron was not a plaintiff in this action.

We reject appellant's assignments of error and affirm the judgment for Chrystal. We also affirm the calculation of damages by the district court as modified for prejudgment interest. We hold, however, that Chrystal should have been permitted to present to the jury her claim for negligent infliction of emotional distress. We reverse for a trial on this issue.

## THE FACTS

On January 11, 1980, Ron and Chrystal Eaton and their thirteen-month-old daughter, Amber, were traveling west on Interstate 80 between Battle Mountain and Winnemucca, Nevada. Their car reached Golconda Summit at about 7:00 p.m. It was dark but the weather was clear. The freeway approaching the summit from the east was dry. The freeway on the western slope was slick with black ice. Black ice is invisible and is one of the most hazardous of all road conditions.

Earlier that evening, two westbound cars slid off the freeway just past the summit due to the ice. These accidents, which did not result in injuries, were reported to the Nevada Highway Patrol at 5:59 p.m. At 6:00 p.m., Trooper Bradley reported to the highway patrol dispatcher that the freeway two to three miles west of Golconda was "solid ice." He requested that sanding trucks be sent to the summit. At 6:34 p.m., Trooper Butler asked the dispatcher whether the sanding trucks were coming out because he had received several reports from truckers of ice on Golconda.

Trooper Butler arrived at the scene of the two accidents at 6:51 p.m. At 7:00 p.m., the drivers of two westbound semi-trucks pulled over to the shoulder to put on chains. The trucks were slipping on the black ice. They parked the trucks just west of the summit. From that point, the drivers could not see the two cars off the road or the flashers of the patrol car because the freeway

---

[1]The district court reduced the award to a total of $82,352.65 pursuant to NRS 17.425 and NRS 41.035(1).

curved. Trooper Butler did not place cones or flares to warn oncoming motorists of the black ice.

Ron testified that he did not see a sign warning of possible icy conditions on the summit. The Eatons reached the crest of Golconda without difficulty. Ron had no way of knowing of the black ice a few yards ahead. At 7:10 p.m., the Eatons' car headed down the western slope of Golconda at about fifty miles per hour. Amber, who had been ill, had just finished nursing and was asleep in her mother's lap. Ron changed into the left lane to give the two semis on the shoulder more room. Then he saw another semi ahead in the same lane traveling at five to fifteen miles per hour. Ron tried to change lanes again and to slow down. The car slid on the black ice. The car slammed into the rear of the semi. The impact dislocated Chrystal's ankle. Amber was crushed between Chrystal and the dashboard. Amber died on impact of head injuries. Believing Amber to be asleep, Chrystal handed her through the car window to the patrolman. Ron later went to the patrol car to check on Amber. He was told she was dead. Ron began shouting to Chrystal that the baby was dead. Chrystal heard Ron screaming but could not believe that Amber was dead. When she asked the patrolman about her baby, he just shook his head.

After the Eaton accident, the patrolman ordered a trucker to prevent westbound traffic from crossing the summit. This lane was closed until the western slope of Golconda Summit was sanded.

As a result of Amber's death and her own injuries, Chrystal became depressed and lost twenty pounds. She spent several weeks while her ankle was in a cast lying in the family den with the lights off. Chrystal sued Ron Eaton, the driver of the semi the Eatons hit, his employer, and the State of Nevada, among others. Chrystal settled with all the defendants except the State and proceeded to trial against the State alone. The State appeals from the judgment for Chrystal and from the calculation of the damages. Chrystal cross-appeals from the district court's failure to instruct the jury on her claim for negligent infliction of emotional distress and from the calculation of damages.

## THE LIABILITY OF THE STATE

Appellant contends that the district court erred by admitting evidence on the failure of State employees, the highway patrol troopers, to place flares or otherwise warn motorists of the black ice. The State's pretrial motion *in limine* to exclude such evidence was denied. The State argues that the placement of warning flares is a discretionary act. Therefore, the State suggests, it is immune

from liability for the failure of its employees to place warning flares. NRS 41.032(2).[2] We disagree. This court has held:

> [T]he State has a duty to exercise due care to keep its highways reasonably safe for the traveling public. Inherent in this duty of care is the alternative duty to either remedy a known hazardous condition on its highways or give appropriate warning of its presence. [Citations omitted.]

State v. Kallio, 92 Nev. 665, 667, 557 P.2d 705, 706 (1976). In the case at bar, the State through its highway patrol knew of the black ice on the western slope of Golconda Summit one hour before the Eaton accident occurred. Furthermore, a highway patrol trooper was on the scene twenty minutes prior to the accident but did nothing to warn oncoming motorists of the hazard. The icy road was not sanded until after the fatal crash. Under these facts, the State could be held liable for failure to warn motorists of the known hazard. *Id.* The district court did not err by admitting evidence on the use or absence of flares.

## THE CALCULATION OF DAMAGES

Both parties challenge the district court's calculation of damages. The jury awarded Chrystal $40,472.65 for her personal injuries and $100,000 for the wrongful death of Amber. Chrystal settled with all defendants except the State for $29,000. Pursuant to NRS 17.245,[3] the district court reduced the jury award by $29,000. The court subtracted $8,120 of the $29,000 from the personal injury award. The court subtracted the remainder of the

---

[2]NRS 41.032(2) provides:
> Except as provided in NRS 278.0233 no action may be brought under NRS 41.031 or against an officer or employee of the state or any of its agencies or political subdivisions which is:
> . . . .
> 2. Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the state or any of its agencies or political subdivisions or of any officer or employee of any of theses, whether or not the discretion involved is abused.

[3]NRS 17.245(2) provides:
> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
> 1. It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and
> 2. It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

$29,000 ($20,880) from the wrongful death award. *See generally* NRS 17.245. The court then reduced the wrongful death award to $50,000, the statutory maximum for claims against the State. NRS 41.035(1).[4] (The personal injury award of $32,352.65 was already below the maximum.) Thus, Chrystal's total award was $82,352.65.

The State argues that the court should have reduced the award on each claim to the maximum under NRS 41.035(1) before subtracting the amount Chrystal received for releasing the other codefendants. We disagree. In a hypothetical case, a plaintiff may settle with all defendants except the State for $75,000. After proceeding to trial against the State, the plaintiff may obtain a $1 million judgment. Under the State's proposal, this judgment would be reduced to $50,000 before the $75,000 received for the release was subtracted. Thus, the State would sustain no liability despite a $1 million judgment against it. This result contravenes the legislative purpose of the statutory waiver of immunity for actions against the State. NRS 41.031 *et seq.* The purpose of these statutes was "to waive immunity and, correlatively, to strictly construe limitations upon that waiver." State v. Silva, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970). We hold that the district court's method of calculating the damages was consistent with this purpose. The district court properly subtracted the $29,000 Chrystal received for releasing the State's codefendants under NRS 17.245 before it reduced the jury award for the wrongful death claim to $50,000 under NRS 41.035.

On her cross-appeal, Chrystal contends the district court erred by allocating the $29,000 Chrystal received in exchange for the release between her two claims. We perceive no error. The district court calculated the percentage of the total jury award that was represented by the personal injury award (28 percent) and the percentage that was represented by the wrongful death award (72 percent). The court then applied 28 percent of the $29,000 to reduce the personal injury award and applied 72 percent of the $29,000 to reduce the wrongful death award. Chrystal does not

---

[4]NRS 41.035(1) provides:

An award for damages in an action sounding in tort brought under NRS 41.031 or against a present or former officer or employee of the state or any political subdivision or any state legislator or former state legislator arising out of an act or omission within the scope of his public duties or employment may not exceed the sum of $50,000, exclusive of interest computed from the date of judgment, to or for the benefit of any claimant. An award may not include any amount as exemplary or punitive damages.

dispute that the $29,000 was in exchange for a release of all claims, including both her personal injury and her wrongful death claims, against the settling defendants. Therefore, we hold that the lower court did not err by allocating the $29,000 between the personal injury and the wrongful death awards. *See* NRS 17.245.

 █

Chrystal also argues that the district court erred by awarding her prejudgment interest on the amount of her past medical bills alone rather than on the entire amount of her personal injury award. *See* NRS 17.130(2).[5] We agree. The personal injury award was based on jury instructions compensating Chrystal for her medical expenses, pain and suffering incurred to the date of the jury verdict. These constitute past damages. Therefore, the entire amount is subject to prejudgment interest. *Id.*

## THE CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Chrystal's complaint alleged damages for emotional distress caused by witnessing the death of Amber. The district court refused to instruct the jury on this claim. The issue presented by this appeal although of first impression in this jurisdiction has been the subject of much commentary and many cases in other jurisdictions.[6]

## THE IMPACT RULE

Traditionally, courts did not allow recovery for emotional distress which neither resulted from nor lead to physical injury or sickness against a defendant who has been merely negligent. II Harper and James, The Law of Torts § 18.4, p. 1031 (1956). A majority of jurisdictions once required that the plaintiff suffer some physical touching or "impact" as a result of defendant's negligent conduct in order to recover for emotional distress.

---

[5]NRS 17.130(2) provides:

> When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest at the rate of 12 percent per annum from the time of service of the summons and complaint until satisfied, except for any amount representing future damages, which draws interest at that rate only from the time of the entry of the judgment until satisfied.

[6]In a related area, this Court recently recognized a cause of action for intentional infliction of emotional distress. Star v. Rabello, 97 Nev. 124, 625 P.2d 90 (1981). The court noted that bystanders may recover for the intentional infliction of emotional distress caused by witnessing the defendant's outrageous conduct to another where the bystander was a close relative of the person against whom the outrage was committed and where the defendant's conduct was "violent and shocking." 97 Nev. at 126, 625 P.2d at 92.

Prosser and Keeton, The Law of Torts, § 54, p. 363 (5th ed. 1984). The requirement of impact, which was supposed to guarantee that the mental disturbance was genuine, has in recent years been satisfied by such minor contact as dust in the eye and smoke inhalation, which played no part in causing the actual harm. *Id.,* § 54, p. 331; Porter v. Delaware, L. & W. R. Co., 63 A. 860 (N.J. 1906) (dust in eye); Morton v. Stack, 170 N.E. 869 (Ohio 1930) (recovery allowed for physical injuries resulting from emotional distress where only physical contact was smoke inhalation). In a few jurisdictions the impact rule still applies to claims for emotional distress. Prosser and Keeton, § 54, p. 365. *See, e.g.,* Champion v. Gray, 420 So.2d 348 (Fla.App. 1982). However, the vast majority of states now reject the impact rule. Rickey v. Chicago Transit Auth., 457 N.E.2d 1 (Ill. 1983); Dziokonski v. Babineau, 380 N.E.2d 1295 (Mass. 1978); Corso v. Merrill, 406 A.2d 300 (N.H. 1979); Whetham v. Bismark Hospital, 197 N.W.2d 678 (N.D. 1972); Schultz v. Barberton Glass Co., 447 N.E.2d 109 (Ohio 1983); Sinn v. Burd, 404 A.2d 672 (Pa. 1979); Garrett by Kravit v. City of New Berlin, 362 N.W.2d 137 (Wis. 1985).

## THE ZONE OF DANGER RULE

Many states replaced the impact rule with the "zone of danger" rule to limit recovery for emotional distress. II Harper and James, ¶ 18.4, p. 1036-37. *See* Rickey v. Chicago Transit Auth., 457 N.E.2d 1; Whetham v. Bismark Hospital, 197 N.W.2d 678. Under the zone of danger rule, a bystander could recover for the emotional distress resulting from observing harm to a close relative occasioned by the defendant's negligence only when that negligence also threatened the bystander-plaintiff with bodily injury. Prosser and Keeton, § 54, p. 365. *See* Annot. 29 A.L.R.3d 1337, 1356. The jurisdictions which embrace the zone of danger rule do so in part because it is "a 'reasonably objective' standard which will 'serve the purpose of holding strict rein on liability'." Bovsun v. Sanperi, 461 N.E.2d 843, 848 (N.Y. 1983) (quoting Tobin v. Grossman, 249 N.E.2d 419, 424 (N.Y. 1969)). *See also* Stadler v. Cross, 295 N.W.2d 552, 554 (Minn. 1980).

## THE DILLON RULE

The California Supreme Court rejected the zone of danger rule in Dillon v. Legg, 441 P.2d 912 (Cal. 1968), its seminal opinion on bystander recovery for negligent infliction of emotional distress. In *Dillon v. Legg,* a young girl was killed by being struck by a car negligently driven by the defendant. The mother and the sister of the victim observed the accident; the sister may have

been in the zone of danger while the mother was not. Justice Torbriner in writing for the court noted:

> The case thus illustrates the fallacy of the rule that would deny recovery in the one situation and grant it in the other. . . . [W]e can hardly justify relief to the sister for trauma which she suffered upon apprehension of the child's death and yet deny it to the mother merely because of a happenstance that the sister was some few yards closer to the accident. The instant case exposes the hopeless artificiality of the zone-of-danger-rule.

441 P.2d 915. Other jurisdictions have criticized and rejected the zone of danger rule. Barnhill v. Davis, 300 N.W.2d 104, 107 (Iowa 1981) ("We reject the harshness and artificiality of the zone of physical danger test"); Dzionski v. Babineau, 380 N.W.2d at 1300 ("Although the zone of danger rule . . . provides a means of limiting the scope of a defendant's liability, it lacks strong logical support"); Paugh v. Hanks, 451 N.E.2d 759, 763 (Ohio 1983) ("We view the 'zone of danger' rule as being unduly restrictive").

The main concern of courts adopting the zone of danger rule for bystander recovery for emotional distress was to prevent the possibility of unlimited and unduly burdensome liability. The *Dillon* court denied that the zone of danger rule had to be invoked to limit liability. Instead, the court held that liability could be circumscribed in these cases, as in all other tort cases, by the application of the general principles of negligence. 441 P.2d at 924. The trial courts could determine whether the accident and the harm to the bystander was reasonably foreseeable and "thus mark out areas of liability, excluding the remote and unexpected." 441 P.2d at 921. We agree with the reasoning of the California court. We "see no good reason why the general rules of tort law, including the concepts of negligence, proximate cause, and foreseeability, long applied to all other types of injury, should not govern the case now before us." 441 P.2d at 924. We therefore reject the zone of danger rule as unnecessary to delineate liability under this cause of action.[7] *See also* II Harper and James, § 18.4, p. 1039 ("mechanical rules of thumb which are at variance with these [general] principles [of tort law] do more

---

[7] Fears that the *Dillon* "foreseeability test" would lead to unlimited liability have proven to be unfounded. "California's subsequent experience demonstrates that the adoption of well-defined foreseeability factors will not lead to unlimited liability, and that the threat of remote and unexpected liability is not a substantial fear." Corso v. Merrill, 406 A.2d at 306. *See also* Versland v. Caron Transport, 671 P.2d 583, 588 (Mont. 1983).

harm than good."). Chrystal was within the zone of danger; indeed, she suffered physical injury as a result of defendant's negligence. Future plaintiffs, however, need not prove that they were in the zone of danger to recover for negligently inflicted emotional distress in Nevada.

1. The doctrine of proximate cause, as a limit on liability, applies to every tort action. "Negligence is not actionable unless, without the intervention of an intervening cause, it proximately causes the harm for which complaint was made." Thomas v. Bokelman, 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970). For a plaintiff to recover for emotional distress caused by witnessing harm to another the plaintiff must prove the defendant's negligent conduct was the proximate cause of the harm to the victim. Dziokonski v. Babineau, 380 N.E.2d at 1302; Bovsun v. Sanperi, 461 N.E.2d at 848. In addition, the plaintiff must prove that the shock of witnessing the harm was the proximate cause of his or her emotional distress. Corso v. Merrill, 406 A.2d at 306; Bovsun v. Sanperi, 461 N.E.2d at 849. "Plaintiff's burden of proving causation in fact should not be minimized. The emotional injury must be directly attributable to the emotional impact of the plaintiff's observation or contemporaneous sensory perception of the accident and immediate viewing of the accident victim."[8] Corso v. Merrill, 406 A.2d at 306. Recovery may not be had, under this cause of action, for the "grief that may follow from the death of the related accident victim," for example. *Id. See also* Keck v. Jackson, 593 P.2d 668, 670 (Ariz. 1979). During trial on this cause of action, Chrystal must demonstrate the degree to which her emotional distress following the accident was the result of being on the scene of and immediately apprehending Amber's death. If she does so, Chrystal may be awarded additional damages based upon the jury's evaluation of this portion of her emotional trauma.

2. The defendant must not only have proximately caused the victim's injuries but he must also be primarily liable for them. Dillon v. Legg, 441 P.2d at 916; Portee v. Jaffee, 417 A.2d 521, 528 (N.J. 1980). "In the absence of the primary liability of the

[8]One of the longstanding arguments against bystander recovery for negligently inflicted emotional distress was the difficulty or impossibility of proving "that the alleged psychic injuries in fact resulted from seeing a gruesome accident." Sinn v. Burd, 404 A.2d at 678. The modern consensus is that "medical science has unquestionably become sophisticated enough to provide reliable and accurate evidence of the causes of mental trauma." Culbert v. Sampson's Supermarkets, Inc., 444 A.2d 433, 436 (Me. 1982). *See also* Schultz v. Barberton Glass Co., 447 N.E.2d at 112; Sinn v. Burd, 404 A.2d at 678.

tort-feasor for the death [or serious injury] of the [victim], we see no ground for an independent and secondary liability for claims for injuries by third parties." Dillon v. Legg, 441 P.2d at 916. Under Nevada's comparative negligence statute, NRS 41.141,[9] a plaintiff may recover for negligently caused injuries only if his or her negligence does not exceed the negligence of the defendant. In the context of bystander recovery, if the victim's negligence exceeds that of the defendant, then the victim cannot recover for his or her injuries and neither can the witness recover for the emotional distress caused by observing those injuries. *Dillon v. Legg, supra; Portee v. Jaffee, supra. See also* Dawson v. Garcia, 666 S.W.2d 254, 260 (Tex.App. 1984) (family members of victim could not recover for emotional distress from witnessing death of victim where the jury found victim 75 percent negligent and the defendant 25 percent negligent under a comparative negligence statute similar to NRS 41.141). Thus, the principles of comparative negligence operate to limit liability in bystander cases just as they do in other types of cases.

[Headnote 11]

3. A further limit on liability requires that the harm occasioned by the defendant's negligence must be foreseeable to be compensable. "A negligent defendant is responsible for all foreseeable consequences proximately caused by his or her negligent act." Taylor v. Silva, 96 Nev. 738, 741, 615 P.2d 970, 971 (1980). Foreseeability is the cornerstone of the *Dillon* test for negligently inflicted emotional distress. The California court reiterated that a defendant was liable for emotional distress proximately caused by his negligence only when such distress was "*reasonably* foreseeable." 441 P.2d at 921. (Emphasis in original.) The Court of Appeals of New York ignored the reasonableness element when it criticized *Dillon v. Legg* for affording no stopping point on liability. Tobin v. Grossman, 249 N.E.2d at 423.[10] The court argued: "If foreseebility be the sole test . . .

---

[9] NRS 41.141 provides in pertinent part:

> 1. In any action to recover damages for death or injury to persons or for injury to property in which contributory negligence may be asserted as a defense, the contributory negligence of the plaintiff or his decedent does not bar a recovery if that negligence was not greater than the negligence or gross negligence of the person or persons against whom recovery is sought, but any damages allowed must be diminished in proportion to the amount of negligence attributable to the person seeking recovery or his decedent.

[10] But, as Justice Torbiner stated in *Dillon v. Legg:*

> [T]he application of tort law can never be a matter of mathematical precision. In terms of characterizing conduct as tortious and matching a money award to the injury suffered as well as in fixing the extent of injury, the process cannot be perfect. Undoubtedly, ever since the

[liability] would extend to . . . any other affected bystander." *Id.* While it may be foreseeable that any bystander would be traumatized by witnessing the death of a child, it is not reasonably foreseeable that a stranger would suffer the same degree of trauma as a parent. Therefore, a defendant would be liable for the serious emotional distress of a parent who witnessed the death or injury of a child but may not be liable for the serious emotional distress of a stranger who also witnessed the accident.

4. In *Dillon v. Legg,* the California court articulated the following factors which trial courts should consider in determining whether the emotional injury to the plaintiff was reasonably foreseeable:[11]

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

441 P.2d at 920. We adopt these factors to assist in calculating the degree of foreseeability of the emotional harm to a plaintiff bystander resulting from the defendant's conduct. Other courts which have permitted actions for negligent infliction of emotional injuries unaccompanied by the risk of physical harm have adopted or followed these guidelines. *See* D'Amicol v. Alvarez Shipping Co., Inc., 326 A.2d 129 (Conn.Sup. 1973); Kelley v. Kokua Sales and Supply, Ltd., 532 P.2d 673 (Hawaii 1975); Dziokonski v. Babineau, 380 N.E.2d 1295; Toms v. McConnell, 207 N.W.2d 140 (Mich.App. 1973); Sinn v. Burd, 404 A.2d 672; D'Ambra v. United States, 338 A.2d 524 (R.I. 1975); Landreth v. Reed, 570 S.W.2d 486 (Tex.Civ.App. 1978). As the Supreme Court of New Jersey noted:

---

ancient case of the tavern-keeper's wife who successfully avoided the hatchet cast by an irate customer (I de S et ux v. W de S, Y.B. 22 Edw. iii, f 99 pl. 60 (1348)), defendants have argued that plaintiff's claims of injury from emotional trauma might well be fraudulent. Yet we cannot let the difficulties of adjudication frustrate the principle that there be a remedy for every substantial wrong.

441 P.2d at 919.

[11]We concur with the *Dillon* court in holding that the emotional injury need not have been actually foreseen by the individual defendant but should have been reasonably foreseeable by the ordinary person under the circumstances. 441 P.2d at 921.

The three factors described in *Dillon* together create a strong case for negligence liability. In any given case, as physical proximity between plaintiff and the scene of the accident becomes closer, the foreseeable likelihood that plaintiff will suffer emotional distress from apprehending the physical harm of another increases. The second requirement of 'direct . . . sensory and contemporaneous observance' appears to reflect a limitation of the liability rule to traumatic distress occasioned by immediate perception. The final criterion, that the plaintiff be 'closely related' to the injured person, also embodies the judgment that only the most profound emotional interests should receive vindication for their negligent injury.

Portee v. Jaffee, 417 A.2d at 526. *See also* Barnhill v. Davis, 300 N.W.2d 104; Versland v. Caron Transport, 671 P.2d 583; Ramirez v. Armstrong, 673 P.2d 822 (N.M. 1983).

All three factors are present in the case at bar. The jury should be permitted to consider them. Chrystal was injured in the accident which killed her daughter, Amber. Thus, she was on the scene and was closely related to the victim. *See* Annot. 94 A.L.R.3d 486. While Chrystal did not immediately realize that Amber was dead, she learned of the tragedy within minutes through sensory and contemporaneous observance of the events following the crash, including her husband screaming that their baby was dead. Chrystal's emotional distress was foreseeable under the factors outlined in *Dillon v. Legg.* The jury should be allowed to consider it.

We agree with the Supreme Court of New Jersey in Portee v. Jaffee, 417 A.2d at 526, that:

The task in the present case, [as in this case] involves the refinement of principles of liability to remedy violations of reasonable care while avoiding speculative results or punitive liability. The solution is close scrutiny of the specific personal interests assertedly injured. By this approach, we can determine whether a defendant's freedom of action should be burdened by the imposition of liability. In the present case, [as in this case] the interest assertedly injured is more than a general interest in emotional tranquility. It is the profound and abiding sentiment of parental love. The knowledge that loved ones are safe and whole is the deepest wellspring of emotional welfare. Against that reassuring background, the flashes of anxiety and disappointment that mar our lives take on softer hues. No loss is greater than a loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more

than pity for one who is stricken by seeing that a loved one has been critically injured or killed.

## CONCLUSION

We affirm the judgment for Chrystal and the calculation of the awards for her personal injury claim and her wrongful death claim as modified for prejudgment interest. We recognize a cause of action for serious emotional distress which results in physical symptoms caused by apprehending the death or serious injury of a loved one due to the negligence of the defendant. We reverse and remand for a trial on this claim.[12]

SPRINGER, C. J., GUNDERSON and STEFFEN, JJ., concur.

---

[12]Any award granted Chrystal is governed by the limitations imposed by NRS 41.035, including the sums she has already been awarded.