TOMMY'S ELBOW ROOM, INC., d/b/a
Tommy's Elbow Room, Appellant,

v.

Ralph KAVORKIAN, Individually and as
Personal Representative of the Estate
of Gladys Marie Kavorkian, Sarah Ka-
vorkian, and Fred Brantingham, Indi-
vidually and as Father and Best Friend
of the Deceased, Tonya Brantingham,
and Martha Brantingham, Appellees.

No. S–79.

Supreme Court of Alaska.

Oct. 31, 1986.

Joseph L. Paskvan, Rice, Hoppner Brown & Brunner, Fairbanks, for appellant.

Marcus R. Clapp and John V. Acosta, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

In *Kavorkian v. Tommy's Elbow Room*, 694 P.2d 160 (Alaska 1985) (*Kavorkian I*),[1] this court upheld the superior court's decision to give a standard proximate cause jury instruction over plaintiffs' (collectively referred to as "Kavorkian") objection. We did not reach the issues raised on cross-appeal because of that outcome. Kavorkian's subsequent petition for rehearing on the proximate cause issue was granted. In *Kavorkian v. Tommy's Elbow Room*, 711 P.2d 521 (Alaska 1985) (*Kavorkian II*), we held that if the tortfeasor's intoxication is a proximate cause of the accident, a liquor licensee who, with criminal negligence, serves the drunken person will be liable for damages. We now consider the cross-appeal issues originally raised in *Kavorkian I*.

---

1. For a recitation of the facts of this case, *see Kavorkian I* and *Pears v. State*, 672 P.2d 903, 909 (Alaska App.1983), *reversed*, 698 P.2d 1198 (Alaska 1985).

## I. EMOTIONAL DISTRESS CLAIMS.

Tommy's Elbow Room ("Tommy's") argues on cross-appeal that in a new trial it should not have to defend against any claims for emotional distress. The superior court instructed the jury during the first trial that, if certain facts were found, plaintiffs Fred and Martha Brantingham could recover for the emotional distress the accident had caused them. We conclude that on retrial the superior court should give an instruction on negligent infliction of emotional harm, but that an instruction for intentional infliction would be improper.

When Pears' truck hit them, Marie and Sarah Kavorkian and Tonya Brantingham were returning home from a Rainbow Girls function. Fred Brantingham, Tonya's father, also had been at the function, but stayed behind to chair a committee meeting. On his way home, Brantingham drove through the intersection of Third Street and the Steese Expressway and noticed that there had been an accident. While he did not realize that the Kavorkian car was involved, he sensed that something was "very seriously wrong." When he reached his house, he found that Tonya was not yet there. He testified: "I went home and I knew—I knew what I was going to find ... I knew that Tonya wasn't going to be there. And so I went home and I found out that she in fact was not there and I talked to my wife—I told my wife that I'd go back...." Brantingham drove back to the intersection and discovered that police and medical technicians were attempting to remove Tonya from the Kavorkians' smashed Datsun. At trial he described what he saw at the scene of the accident:

> [T]hey were taking her out of the car, it was difficult and so they took her out by hanging on to her hair to support her head. And, she had the tube sticking out of her mouth, there was a paramedic who had come through from the other side of the car and picked up the lower part of her body and there was one that met her on this side of the vehicle and—they were doing their best. But, they were hanging on to her head by her hair and

then they almost dropped her. Almost dropped her. It was ... hard to stand there and watch that, but you know that ... you running in there could actually be ... harmful. And so, yeah, I remember that. I'll always remember that. [Tr. 1285] While his daughter was taken to the hospital, Brantingham drove home to get his wife Martha and their son Eric. Tonya's heart continued to beat for several hours, and her parents were present when she died.

### A. Fred Brantingham's Claim for Negligently Inflicted Emotional Distress.

Tommy's argues that Fred Brantingham cannot recover for negligently inflicted emotional distress because he was not in the "zone of danger" when the accident occurred. This is the standard established by the Restatement (Second) of Torts § 313 (1965):

§ 313. *Emotional Distress Unintended.*

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

(2) *The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.*

[Emphasis added.]

While the "zone of danger" standard was once the accepted rule for emotional distress claims, a substantial and growing minority of states have rejected it within the

last decade.[2] Many courts have adopted the guidelines set forth by the California Supreme Court in *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 80, 441 P.2d 912, 920 (1968):

(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

If these factors are strictly applied, Fred Brantingham cannot recover even under *Dillon*. Their application has not, however, been so strict. In *Ochoa v. Superior Court*, 39 Cal.3d 159, 216 Cal.Rptr. 661, 667–668, 703 P.2d 1, 6–7 (1985), the California Supreme Court concluded that the *Dillon* guidelines did not require emotional distress to be caused by a brief and sudden occurrence viewed contemporaneously by the plaintiff in order to be compensable.[3] The court reasoned that such a restriction would "arbitrarily [limit] liability when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event...." *Id.* 216 Cal. Rptr. at 668, 703 P.2d at 7. It stressed that the *Dillon* factors were merely guidelines to be used in assessing whether the plaintiff was a foreseeable victim of the defendant's negligence. *Id.* 216 Cal.Rptr. at 669, 703 P.2d at 8.

Under this liberal interpretation of *Dillon*, focusing on the foreseeability of distress to the plaintiff, the California courts have allowed emotional distress claims in cases where the plaintiff did not actually observe the tortious event. In *Archibald v. Braverman*, 275 Cal.App.2d 253, 79 Cal. Rptr. 723 (1969), a mother came upon her child moments after he had been injured in an explosion. The court observed that the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself, and that therefore the plaintiff had met the contemporaneous observance requirement of *Dillon*. *Id.* 79 Cal.Rptr. at 725. In *Nazaroff v. Superior Court*, 80 Cal.App.3d 553, 145 Cal.Rptr. 657 (1978), a mother was looking for her three-year-old son. She heard a neighbor scream, " 'It's Danny.' [She] immediately had the dreadful knowledge that Danny had somehow gotten into the Beckers' swimming pool and that he was hurt." *Id.* 145 Cal.Rptr. at 659. She arrived on the scene in time to see her missing child pulled from a neighbor's pool and efforts made to resuscitate him. He died three days later. The *Nazaroff* court concluded that there were triable issues of fact as to whether the alleged harm to the mother resulted from an emotional shock proximately caused by the direct emotional impact from the contemporaneous observation of the immediate consequences of the defendants' negligent act, which was the

---

**2.** *See, e.g., Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968); *Montinieri v. Southern New England Tel. Co.*, 175 Conn. 337, 398 A.2d 1180 (1978); *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758 (1974); *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981); *Culbert v. Sampson's Supermarkets*, 444 A.2d 433 (Me. 1982); *Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295 (1978); *Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo.1983) (en banc); *Versland v. Caron Transp.*, 671 P.2d 583 (Mont.1983); *State v. Eaton*, 101 Nev. 705, 710 P.2d 1370 (1985); *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979); *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980); *Ramirez v. Armstrong*, 100 N.M. 538,

673 P.2d 822 (1983); *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983); *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979); *D'Ambra v. United States*, 114 R.I. 643, 338 A.2d 524 (1975).

**3.** In *Ochoa*, parents witnessed the neglect of the medical personnel in a juvenile hall infirmary who were charged with caring for their ill son, who died as a result of that neglect.

Counsel for appellees have conceded that they are not advancing a claim on behalf of Martha Brantingham for negligently inflicted emotional distress.

proximate cause of the injury and death of her son.[4]

However, at least one California court has somewhat limited the expansion of *Dillon*. In *Madigan v. City of Santa Ana*, 145 Cal.App.3d 607, 193 Cal.Rptr. 593 (1983), a parent and step-parent arrived at the accident scene fifteen minutes after the accident occurred. They observed the damaged cars and knew that their son was in the Volkswagen; they were told that all occupants of the Volkswagen had been killed. The court of appeal held that *Dillon* precluded a cause of action by the parent and step-parent for the negligent infliction of emotional distress, stating that

> [t]he rule of *Dillon* as applied in all subsequent cases requires some sensory and contemporaneous observance of the accident. That is clearly absent here; there is no showing plaintiffs *saw, heard or otherwise sensorially perceived* the event which produced the injury. To ex-

pand the clear requirements of *Dillon* would without question begin "a first excursion into the 'fantastic realm of infinite liability,'" so ominously predicted by the dissent in *Dillon*.[5]

*Id.* 193 Cal.Rptr. at 595–96 (emphasis in original).

The *Madigan* approach is not faithful to the *Dillon* progeny and has been rejected in a more recent California appellate decision. In *Nevels v. Yeager*, 152 Cal.App.3d 162, 199 Cal.Rptr. 300, 305 (1984), the court noted that the *Dillon* majority rejected the claim that a meritorious cause of action should go unrecognized for fear of opening the "floodgates of litigation," and added that the *Dillon* guidelines had become "requirements" in *Madigan*. It held that such rigidity was antithetical to its interpretation of *Dillon* and to its concept of foreseeability. *Id.*[6]

---

4. As noted in *Ochoa*, 216 Cal.Rptr. at 686 n. 9, 703 P.2d at 25 n. 9, other states are increasingly permitting recovery for emotional distress in situations where the *Dillon* guidelines are not explicitly satisfied. *See, e.g., Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980) (permitted recovery by a mother and children for emotional distress from witnessing husband-father in a hospital after he had sustained quadriplegic injuries in a work-related accident; the Massachusetts Supreme Judicial Court stated that "[a] plaintiff who rushes onto the accident scene and finds a loved one injured has no greater entitlement to compensation for that shock than a plaintiff who rushes instead to the hospital. So long as the shock follows closely on the heels of the accident, the two types of injury are equally foreseeable." (*Id.* 413 N.E.2d at 697)); *Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295 (1978) (permitted recovery for a mother's wrongful death where mother suffered severe shock and died from a resulting heart attack while she was a passenger in the ambulance that was carrying her daughter to the hospital; daughter had been run over due to the defendant's negligence and mother who lived in the vicinity had arrived on the accident scene and had witnessed her injured daughter lying on the ground); *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980) (permitted recovery by a mother who did not see original accident in which her young son was trapped between the outer door of a moving elevator and the wall of the shaft, but who was summoned to the scene and witnessed the agonizing slow death of her son from crushing injuries as police unsuccessfully sought to free the child); *Mercado v.*

*Transport of New Jersey*, 176 N.J.Super. 234, 422 A.2d 800 (1980) (permitted recovery by a mother who learned of the accident minutes after it happened, went to scene and saw her injured son in the street); *General Motors v. Grizzle*, 642 S.W.2d 837 (Tex.App.1982) (permitted recovery by a mother who arrived at scene moments after accident).

5. The California Court of Appeal has followed *Madigan* in less compelling circumstances. *See, e.g., Ebarb v. Woodbridge Park Ass'n*, 164 Cal. App.3d 781, 210 Cal.Rptr. 751 (1985).

6. In *Nevels*, the plaintiff was at home three-quarters of a mile away when the accident occurred. In response to a telephone call, the victim's mother rushed to the scene of the accident and arrived within ten minutes of its occurrence. 199 Cal.Rptr. at 301. There she saw her thirteen-year-old daughter lying in the street "'with blood coming from her nose and her ears and she was screaming and screaming and screaming. Her hair was full of blood and blood was everywhere. Two paramedics were working on her.'" *Id.* The court held that foreseeability is a question for the trier of fact unless the undisputed facts provide no basis for a reasonable difference of opinion. *Id.* 199 Cal. Rptr. at 305. In *Nevels*, where the appellant was near the scene of the accident involving her child, and where her perception of the accident was substantially contemporaneous, the court ruled that it could not be said as a matter of law that her appearance at the scene would not be foreseeable. *Id.*

This state has not previously recognized a bystander's right to recover damages for negligent·infliction of emotional distress caused by injury to another. In doing so in this case, we join the jurisdictions which had adopted the *Dillon* guidelines and agree with the more liberal interpretation of those guidelines. The touchstone of *Dillon* is not a rigid requirement of sensory and contemporaneous observance of the accident, but rather is the reasonable foreseeability that the plaintiff-witness would suffer emotional harm. In this case, Fred Brantingham was Tonya's father. Aware of the occurrence of an accident, he arrived home and, finding that his daughter was not there, immediately realized that she must have been involved in the accident. Upon arriving at the scene, as in *Archibald* and *Nazaroff*, he perceived and suffered shock from observing his child's injury. *See Ochoa,* 216 Cal.Rptr. at 669, 703 P.2d at 8. We cannot say as a matter of law that it was not reasonably foreseeable that he would appear at the scene of the accident. We therefore conclude that Fred Brantingham is entitled to an instruction on the negligent infliction of emotional harm.

### B. Fred and Martha Brantingham's Claims for Intentional Infliction of Emotional Distress.

In *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985), we adopted the Restatement's elements of a claim of intentional infliction of emotional distress. Under the Restatement (Second) of Torts § 46 (1965):

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he *intentionally or recklessly* causes severe emotional distress

(a) *to a member of such person's immediate family who is present at the time,* whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

[Emphasis added.]

We hold that in the factual context of this case the superior court abused its discretion in giving an instruction on the intentional infliction of emotional distress.[7] While the law appears to be moving toward imposing liability for this tort, recovery thus far it has been limited to the most extreme and outrageous cases of violent attack, where fright or shock is especially likely. W. Keeton, *Prosser and Keeton on The Law of Torts* § 12, at 66 (5th ed. 1984). The Restatement notes:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse

---

**7.** We do not reach the issue of whether Fred Brantingham is precluded from claiming intentional infliction of emotional distress because he was not "present at the time" of the defendant's allegedly tortious conduct. We note that even if we were to extend the defendant's liability to those family members who witnessed the immediate consequences of the defendant's conduct, as we have done under the negligent infliction doctrine, Martha Brantingham would be unable to sustain a claim under the facts of this case.

his resentment against the actor, and lead him to exclaim, "Outrageous!" § 46 comment d.

■■■■ In cases where the plaintiff alleges that the defendant acted recklessly, it must be shown that the defendant acted in deliberate disregard of a high degree of probability that the emotional distress will follow. *See id.* comment i. While Tommy's may have acted negligently and illegally, we hold as a matter of law that its conduct does not rise to the level necessary to sustain a claim of intentional infliction of emotional harm. Tommy's act of serving liquor to Richard Pears did not create a high degree of probability that someone would suffer emotional distress. While it may have been reasonably foreseeable that an intoxicated Pears would drive, have a serious accident, and cause, among other damages, emotional distress, these facts cannot be reasonably regarded as highly probable.

## II. DUTY TO TRAIN.

Tommy's also argues on cross-appeal that the superior court erred in instructing the jury that AS 04.21.030 is a basis for civil liability. We agree.

Kavorkian argued to the trial court that Tommy's had a duty to exercise reasonable care in training its employees to recognize "drunken persons," pursuant to AS 04.21.-030, and that failure to meet this duty subjects Tommy's to liability for damages.[8]

■■■ Alaska Statute 04.21.030 does not impose civil liability on licensees. The Alcoholic Beverage Control Board refers to this statute in determining whether to suspend or revoke a license.[9]

8. AS 04.21.030 states:
*Responsibility of licensees, agents and employees.* The licensee has a duty to exercise that degree of care which a reasonable person would observe to insure that a business under his control is lawfully conducted. This duty of the licensee includes, but is not limited
 (1) to insuring the compliance by agents or employees with this title and regulations adopted under this title, including acting with reasonable diligence to determine that his agents or employees are advised of the provision of this title and the regulations adopted under this title, either by securing the agent's or employee's written acknowledgement of posted instructions or otherwise; and
 (2) to insuring the compliance of the premises with public health, fire, and safety codes and ordinances of the state or municipality having jurisdiction.

9. The committee report for AS 04.21.030 states:
This section requires that a licensee shall make every effort a prudent person would in the operation and management of his licensed business.
It is the intent of this section that it present a standard whereby it may be determined whether a licensee who has no actual knowledge of the violation of a liquor law by an agent or employee has nonetheless acted without the reasonable care that the manager of a business should exercise [and] may be held to be responsible for the violation. The standards in this section are applied by the board in making the finding required under sec. 04.11.535 before a license may be revoked or suspended on grounds of violation of a liquor

law by an agent or employee. It is further the intent of this section that the burden is on the licensee to take reasonable preventive measures to insure violations do not occur on the licensed premises.
1 Senate Journal Supp. No. 23, at 20 (1980).
Also, the police and the Alcoholic Beverage Control Board look to AS 04.21.030 and AS 04.16.150 in determining when it is appropriate to file a criminal complaint against a licensee. AS 04.16.150 states:
*Licensee responsible for violations.* A licensee may neither knowingly allow his agents or employees to violate this title or regulations adopted under this title nor recklessly or with criminal negligence fail to act in accordance with the duty prescribed under AS 04.21.030 with the result that an agent or employee of the licensee violates a law or regulation.
The committee report for AS 04.16.150 states:
It is the intent of this section that the licensee is responsible for violations of this title, and its regulations, by his agent or employees if he failed to observe what was plain and easily seen or discovered, or because, having observed, he ignored that which was apparent. This sanction is in addition to administrative sanctions which may be imposed under sec. 04.11.370(5) against a licensee who allows his agents or employees to violate this title. Also note that under sec. 04.11.535(b) if the board finds that a licensee knowingly, recklessly, or with criminal negligence "allowed" the unlawful action of an agent or employee, the board is obliged to file a criminal complaint charging the licensee with violation of this section.
1 Senate Journal Supp. No. 23, at 18 (1980).

The standard of care that a liquor licensee must meet to avoid civil liability is set forth elsewhere. AS 04.21.020 provides in pertinent part:

*Civil liability of persons providing alcoholic beverages. A person who provides alcoholic beverages to another person may not be held civilly liable for injuries resulting from the intoxication of that person unless* the person who provides the alcoholic beverages holds a license authorized under AS 04.-11.080—04.11.220, or is an agent or employee of such a licensee and

. . . .

(2) *the alcoholic beverages are provided to a drunken person in violation of AS 04.16.030.*

[Emphasis added.]

AS 04.16.030, in turn, provides:

*Sale or disposition of alcoholic beverages to drunken persons.* A licensee, his agent, or employee may not with criminal negligence

(1) sell, give, or barter alcoholic beverages to a drunken person; . . . .

■ This statutory scheme thus establishes that unless a drunken person is served with "criminal negligence," the person who serves him is not civilly liable for injuries resulting from the drunken person's intoxication.[10] Thus we conclude that it was error on the superior court's part to permit the jury to consider AS 04.21.030 in determining Tommy's liability.

## III. THE WRONGFUL DEATH DAMAGES INSTRUCTIONS.

Tommy's challenges the superior court's jury instructions regarding the damages allowed under AS 09.55.580 for Marie Kavorkian's wrongful death.[11] It also argues that punitive damages are not recoverable under the statute.

### A. Instructions Nos. 23, 24, and 29.

Tommy's contends that the trial court erred in giving Instruction No. 23 because its last sentence implies that there was no limitation to the harm for which Ralph and Sarah Kavorkian could recover. The instruction read in part:

In fixing the total amount of the loss for each beneficiary, there are several items of loss that each beneficiary may have suffered. I will describe each of these items for you, and you must consider, for each beneficiary, each of these items of loss that you find was legally caused by the acts of the defendants. *You may also consider other items of loss suffered by each beneficiary and supported by the evidence in this case.*

[Emphasis added.]

The relevant section of the wrongful death statute, AS 09.55.580(c), provides:

In fixing the amount of damages to be awarded under this section, the court or jury shall consider all the facts and circumstances and from them fix the award at a sum which will fairly compensate for the injury resulting from the death. In determining the amount of the award, *the court or jury shall consider but is not limited to the following:*

(1) deprivation of the expectation of pecuniary benefits to the beneficiary or

---

**10.** AS 04.21.080(a)(1) and (b)(8) define "criminal negligence" and "drunken person," respectively.

**11.** AS 09.55.580 distinguishes between decedents who are survived by a spouse, children, or "other dependents" ("statutory beneficiaries") and those who are not. For text of relevant section, *see infra* n. 12. If the decedent is survived by statutory beneficiaries, wrongful death damages are measured by loss to the survivors. If no beneficiaries survive, damages are measured by loss to the estate. *Matter of Estate of Pushruk,* 562 P.2d 329, 330–31 (Alaska 1977). This case encompasses two wrongful death claims. One

decedent, Marie Kavorkian, was survived by her husband and daughter, Ralph and Sarah. The other decedent, Tonya Brantingham, was survived only by her parents. Ralph and Sarah are statutory beneficiaries; Tonya's parents are not. The jury instructions challenged here (23, 24 and 29) apply only to the Kavorkian claim, and correctly assume a measure of damages of loss to the survivors. None of the discussion of Instructions 23, 24 or 29 applies to the Brantingham claim, where the measure of damages is loss to the estate. *See Osborne v. Russell,* 669 P.2d 550, 560 (Alaska 1983).

beneficiaries, without regard to age thereof, that would have resulted from the continued life of the deceased and without regard to probable accumulations of what the deceased may have saved during the lifetime of the deceased;

(2) loss of contributions for support;

(3) loss of assistance or services irrespective of age or relationship of decedent to the beneficiary or beneficiaries;

(4) loss of consortium;

(5) loss of prospective training and education;

(6) medical and funeral expenses.

[Emphasis added.] [12]

 We hold that the superior court erred in giving the quoted instruction. AS 09.55.580(c) is not to be construed as open invitation to the jury to award damages for any or all injuries or losses resulting from the death. Here our review of all of the superior court's instructions on damages brings us to the conclusion that the challenged portion of Instruction No. 23 was unnecessary and potentially confusing. Not only is the instruction unauthorized, but the damages recoverable in a wrongful death action were adequately covered by the court's additional damage instructions.

Tommy's also contends that the trial court erred in giving Instruction No. 24 because it does not stress "loss to the survivors." We find no error in the giving of Instruction No. 24, but at retrial we think a more explicit instruction should be given. The challenged instruction states:

The first item of possible loss is the possible loss of money or property that each beneficiary could have reasonably expected to receive from Gladys Kavorkian had she continued to live.

This item of loss includes both the loss, if any, of money and property, including support, that the deceased would have given to each beneficiary during the deceased's lifetime and any savings or accumulations the deceased would have produced during her natural life and which would have gone to the beneficiary on the deceased's death.

In fixing this amount, you may consider along with other evidence, evidence relating to the willingness of the deceased to provide monetary benefits, the extent of the benefits customarily provided, and the benefits reasonably expected to be provided by a wife and mother. You may consider the contributions and support each beneficiary would have received from the deceased even though the deceased may not have been legally required to provide them.

To determine how much money the deceased would have had available to each beneficiary, you should do the following:

First, compute the amount the deceased would have earned had she lived from the date of her death to the present and subtract from that figure an amount representing the income taxes the deceased would have paid on those earnings and also subtract an amount representing what the deceased would have

---

**12.** AS 09.55.580(a) and (b) state:

(a) When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had the person lived, against the latter for an injury done by the same act or omission. The action shall be commenced within two years after the death, and the damages therein shall be the damages the court or jury may consider fair and just. The amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children when the decedent is survived by a spouse or children, or other dependents. When the de-

cedent is survived by no spouse or children or other dependents, the amount recovered shall be administered as other personal property of the decedent but shall be limited to pecuniary loss. When the plaintiff prevails, the trial court shall determine the allowable costs and expenses of the action and may, in its discretion, require notice and hearing thereon. The amount recovered shall be distributed only after payment of all costs and expenses of suit and debts and expenses of administration.

(b) The damages recoverable under this section shall be limited to those which are the natural and proximate consequence of the negligent or wrongful act or omission of another.

spent on herself had she lived. Second, compute the amount of earnings the deceased would have earned from the present to the end of her natural life expectancy. Do not subtract the income taxes she would have paid but do subtract an amount representing what the deceased would have spent on herself had she lived to the end of her natural life expectancy. The sum of these two calculations is the amount the deceased would have had available to give the beneficiaries.

■ This instruction directs the jury to compute what Marie Kavorkian's earnings would have been and subtract a sum representing what she would have spent on herself. This is a "shorthand" method for another, more exacting method in which the fact-finder attempts to specify the contributions the deceased in fact would have made to her household. 1 S. Speiser, *Recovery for Wrongful Death 2d* § 3.6, at 142 (1975). This "shorthand" method is more common and involves fewer computations. *Id.* We find no error in using it.

■ However, the instruction does not explicitly direct the jury's attention to how long each of the individual beneficiaries would have received contributions. In a case in which an aging parent depends on a wage-earning child, for example, the parent's life expectancy is obviously relevant to the estimation of how much money the parent might have received from the child. *See generally* Speiser, *supra*, at § 3.22. Ideally, the instruction should ask the jury to determine how long each beneficiary would have received benefits. In this case, the omission was harmless. Plaintiffs' expert testified as if the instruction had actually called attention to each beneficiary's circumstances. He told the jury that if Marie Kavorkian had lived, Sarah Kavorkian would presumably have left home after graduating from college, and that Sarah's recovery should reflect this fact. He also emphasized that in computing the fair value of "assistance and services" Ralph Kavorkian would have received, the fact that Ralph's life expectancy was less than Ma-

rie's should be taken into account. Practically speaking, the omissions probably made little difference. Moreover, the instruction was not incorrect, but incomplete. In four separate places it refers to "each beneficiary." The verdict forms told the jury to make separate wrongful death awards for Ralph and Sarah Kavorkian. While it is likely that the jurors would estimate how long Ralph and Sarah each would have received benefits from Marie, on retrial they should be explicitly instructed to make this calculation.

■ Tommy's also contends that the trial court erred in giving Instruction No. 29 because Alaska's wrongful death statute does not provide for damages for the mental anguish of beneficiaries. We hold that under AS 09.55.580, spouses, children, and other dependents of the decedent may recover for their anguish, grief, and suffering resulting from the wrongful death.

In *Dralle v. Steele*, 13 Alaska 680, 688 (D.Alaska 1952), the court held that under Alaska's wrongful death statute, a claimant's recovery was limited to pecuniary damages, and that no allowance could be made for mental anguish. § 61–7–3, ACLA 1949. In 1955, the statute was amended to list six items specially recoverable by beneficiaries, one of which is loss of consortium. Ch. 153, § 1, SLA 1955 (now AS 09.55.580(c)). It also provided that damages should include those elements "which are the natural and proximate consequence of the negligent or wrongful act or omission" of the defendant and that the court or jury should arrive at an award that "will fairly compensate for the injury resulting from the death." Ch. 153, § 1, SLA 1955 (now AS 09.55.580(b) and (c)). In 1960, the statute was further amended to add that the amount the claimants could recover should be the "damages as the court or jury may deem fair and just." Ch. 163, § 1, SLA 1960 (now AS 09.55.580(a)).

Other jurisdictions are split on this issue. California, for example, has consistently refused to allow recovery for a claimant's pain and suffering in a wrongful death

action. *See, e.g., Krouse v. Graham*, 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022 (1977). We agree, on the other hand, with the reasoning of jurisdictions such as Arizona that hold that where a statute allows damages for loss of companionship, comfort and guidance, it would be inconsistent to forbid recovery for the emotional pain suffered by a claimant as a result of the death. *See City of Tucson v. Wondergem*, 105 Ariz. 429, 466 P.2d 383, 387 (1970) (en banc). *See also Dawson v. Hill & Hill Truck Lines*, 671 P.2d 589, 592 (Mont. 1983). If a jury can evaluate the intangible loss suffered from not having the decedent's care, comfort and companionship, then that same jury can be trusted to ascribe damages to grief. *Dawson*, 671 P.2d at 592. We hold that when a jury finds that damages for pain and suffering are necessary to "fairly compensate for the injury resulting from the death," or to render the award "fair and just," it may award them under the wrongful death statute.[13]

### B. Punitive Damages under the Wrongful Death Statute.

The superior court ruled that punitive damages were available under Alaska's wrongful death statute, but ordered that the trial be bifurcated as to the issues of compensatory and punitive damages. Since the jury found in favor of Tommy's, it never reached the punitive damages claims.

■ Tommy's argues that punitive damages are not permitted by AS 09.55.-580. The precise issue we face is whether the language of the statute providing that the court or jury should award the damages it "may consider fair and just" allows a claim for punitive damages. We hold

that it does when there is clear evidence that the wrongdoer acted maliciously, fraudulently, or with a wanton disregard for the decedent's safety.

In Alaska, punitive damages are not favored in law. *Alaska Placer Co. v. Lee*, 553 P.2d 54, 61 (Alaska 1976). They are to be allowed only with caution and within narrow limits. *Id.* We have stated, however, that although an action for wrongful death is statutory, we have found no legislative intent to treat it differently than common law tort actions. *Haakanson v. Wakefield Seafoods*, 600 P.2d 1087, 1092 (Alaska 1979). The incongruous result of treating wrongful death actions differently than common law tort actions with respect to awarding punitive damages has been the basis of several courts' decisions on this issue. It is unlikely that a legislature would intend that a person injured by a negligent defendant may recover punitive damages, but that the estate of one killed by such a person may not, when the purpose of awarding punitive damages is deterrence. *See* Speiser, *supra*, § 3.4, at 135. "The nature and quality of the wrongful act should dictate whether its perpetrator should be compelled to respond in more than compensatory damages—not the fortuitous circumstances whether he happens to injure or kill his victim." *Id.*

This was the basis of the Idaho Supreme Court's decision in *Gavica v. Hanson*, 101 Idaho 58, 608 P.2d 861 (1980). That state's wrongful death statute provides that "such damages may be given as under all the circumstances of the case may be just." Idaho Code § 5–311 (1979 & Supp.1985). The court construed this language to permit punitive damages because to hold otherwise would violate the precept that the

---

**13.** This claim should not be confused with a claim for negligent or intentional infliction of emotional distress. The two are separate and distinct. A negligent or intentional infliction action compensates for mental distress from having witnessed an accident or the immediate consequences of an accident; the mental distress for which recovery can be sought under the wrongful death statute is limited to mental anguish, sorrow, or grief resulting from the

death itself. *Dawson*, 671 P.2d at 593. When the two actions are joined in one case, damages for intentional or negligent infliction must be limited to damages caused by the witnessing of the accident or its immediate consequences, and damages awarded for mental distress as the result of wrongful death must be limited to those caused by the loss of the decedent's life. *Id.*

court should avoid a statutory interpretation that produces an absurd result.[14] 608 P.2d at 864.

The West Virginia wrongful death statute provides that the jury "may award such damages as to it may seem fair and just." W.Va.Code, § 55–7–6 (1981 & Supp. 1985). In *Bond v. City of Huntington,* 276 S.E.2d 539, 545 (W.Va.1981), the court held that this language included punitive damages. The court found the deterrence principle of punitive damages to be "perfectly compatible" with a wrongful death claim, and perhaps even more appropriate in wrongful death actions than in actions for less severe injuries. *Id.* "The fact that the wrongful death statute never spelled out particular items of damages has not precluded this court in the past from concluding that certain elements of damages could be obtained." *Id. See also Behrens v. Raleigh Hills Hosp.,* 675 P.2d 1179, 1185 (Utah 1983).

We agree with this reasoning. This does not mean that punitive damages are available in every wrongful death case, of course. As at common law, punitive damages will be awarded where a wrongdoer's conduct can be characterized as outrageous, such as acts done with malice or bad motive, or reckless indifference to interests of another and conscious action in deliberate disregard of them. *Sturm, Ruger & Co. v. Day,* 594 P.2d 38, 46 (Alaska 1979), *modified,* 615 P.2d 621 (Alaska 1980), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), *overruled on other grounds in Dura Corp. v. Harned,* 703 P.2d 396, 405 n. 5 (Alaska 1985); *Bridges v. Alaska Housing Authority,* 375 P.2d 696, 702 (Alaska 1962).

## IV. TOMMY'S PAST CONDUCT.

 Tommy's argues that the superior court erred in allowing witnesses to testify that on other occasions Tommy's had served liquor to drunken persons, and that

at least the trial court should have conducted a preliminary hearing out of the jury's presence before the witnesses testified. Tommy's objects to:

1. Joseph Wotopka's assertion that occasionally he had been under the influence of alcohol while in Tommy's;

2. Fairbanks police detective John Baus's testimony that during the pipeline years Tommy's had served drunks;

3. Officer Mark Wayson's memory that in 1970 and 1971 Tommy's had served drunks;

4. David Brennan's claim that he had often been served in Tommy's while drunk.

In each instance Judge Hanson allowed the testimony and permitted extensive cross-examination concerning it. Tommy's defense in part was that its policies forbade serving drunks and that, compared to other saloons on Second Avenue, it was a "good bar." The testimony was offered to combat this defense, establish a pattern of criminal negligence, and show that Tommy's' routine practice was to serve drunks. We agree with Kavorkian that under the circumstances this testimony was admissible. Evidence Rule 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

The superior court's specific decisions concerning the disputed items of evidence are defensible under Rule 406. Officer Wayson's assertions concerning twelve-year-old events arguably were irrelevant, but they followed Gloria Paskvan's claim that for thirty-five years Tommy's had refused to serve drunks and were admissible to refute that claim.[15]

---

14. The court stated its rationale succinctly: "If wrongful conduct is to be deterred by the award of punitive damages, that policy should not be

thwarted because the wrongdoer succeeds in killing his victim." 608 P.2d at 864.

15. Since we consider this evidence relevant and admissible, we do not reach the issue of wheth-

### V. TESTIMONY REGARDING MICHAEL LESSMEIER.

Kavorkian employed Michael Lessmeier, an attorney, to prepare and notarize affidavits with which adverse witnesses could be confronted. Kavorkian called two witnesses, Joseph Wotopka and Kristina Hall, whose testimony was less favorable than Kavorkian would have liked on the issue of Richard Pears' apparent drunkenness. Kavorkian's counsel confronted them with their affidavits and asked for an explanation. On cross-examination the witnesses suggested that Lessmeier might have pressed them into making statements they now wished to qualify. Tommy's then called Andrew Lundquist, who testified that Pears did not appear to be drunk when he saw him at Tommy's the night of the accident. Tommy's then began a line of questioning intended to elicit from Lundquist complaints about Lessmeier's activities. The superior court refused to allow this testimony.

On appeal, Tommy's presents two theories under which Lundquist's evidence should have been admitted. First, it claims that badgering potential witnesses is an "admission" that one's case is weak. The superior court flatly rejected this approach, although it is true that sufficiently improper conduct may constitute an admission. *See Schaff v. Coyle*, 121 Okl. 228, 249 P. 947, 955 (1925) (party's agent tries to bribe witness). Nevertheless, the facts here simply do not rise to this level. Tommy's second argument is that Lundquist's testimony would have helped to rehabilitate witnesses Wotopka and Hall by casting doubt on their affidavits. In our view, the superior court correctly decided to focus the pro-

ceedings on witnesses', not attorneys', credibility and correctly applied the Evidence Rule 401/403 balancing test.[16]

Therefore, the superior court's decision on the cross-appeal issues originally raised in *Kavorkian I* is AFFIRMED in part and REVERSED in part.

---

er the superior court should have held a separate preliminary hearing to evaluate the testimony. *See Patricia R. v. Sullivan*, 631 P.2d 91, 96 (Alaska 1981).

16. We disagree with Tommy's that the case is moot. Since the superior court vacated the damage award as inadequate, ordering a new trial against Pears on the issue of damages, the damage award has no preclusive effect.

We also disagree with Tommy's contention that at retrial, all punitive damages claims should have to survive a preliminary hearing

before being presented to the jury. The superior court granted Tommy's motion to sever the punitive from the compensatory claims. If the jury finds Tommy's liable, then the trial court will decide whether the evidence is sufficient to submit the punitive damages claims to the jury. If the superior court decides that the evidence is sufficient to support the claims, there is no "prejudicial" evidence from which to insulate the jury, and a preliminary hearing would serve no purpose.